David HEGGARTY, Plaintiff, Appellant,

v.

Louis W. SULLIVAN, MD, Secretary
of Health and Human Services,
Defendant, Appellee.

No. 91–1260.

United States Court of Appeals,
First Circuit.

Submitted June 6, 1991.

Decided Sept. 25, 1991.

Ronald B. Eskin and James Breslauer, on brief, for plaintiff, appellant.

Wayne A. Budd, U.S. Atty., Annette Forde, Asst. U.S. Atty., and Robert M. Peckrill, Asst. Regional Counsel, Dept. of Health & Human Services, on brief, for defendant, appellee.

Before BREYER, Chief Judge, SELYA and CYR, Circuit Judges.

PER CURIAM.

Claimant, David Heggarty, applied for Social Security disability and supplemental security income benefits on September 20, 1988. He claimed an onset date of May 5, 1987 and alleged disability due to gout, allergies, emotional problems, alcoholism (in remission), eczema and high blood pressure. His claim was denied initially and upon reconsideration. A hearing before an administrative law judge ("ALJ") was held on June 20, 1989; claimant appeared without counsel at the hearing. The ALJ found that claimant was not disabled and the Appeals Council denied claimant's request for review. The district court affirmed the Secretary's decision, 758 F.Supp. 40, and this appeal ensued.

Claimant presents the following arguments on appeal: (1) claimant met Listing 8.05 (atopic dermatitis); (2) claimant did not receive a full and fair hearing because the ALJ did not inform him that he could obtain legal representation at no cost and because the ALJ failed to obtain important medical evidence; (3) there was not sufficient evidence in the record upon which to ascertain claimant's mental residual functional capacity; (4) the ALJ did not properly evaluate claimant's complaints of pain; and (5) testimony from a vocational expert was required in this case.

## I. ADMINISTRATIVE PROCEEDINGS

### A. *The Hearing*

At the beginning of the hearing, the following exchange took place.

ALJ: The record can show the claimant is present, but not represented or accompanied. You were told and you understand your right to counsel or representation, Mr. Heggarty?

CLMT: I do, sir.

Claimant went on to testify that he was born in 1953 and has completed high school. He also has trained in culinary arts. Claimant's past relevant employment includes work as a bartender and as a "deli-man" in a supermarket. According to claimant, he has held over fourteen jobs since 1978. He usually has been fired due to his drinking and bad temper. Claimant also stated that he had entered a detoxification program at Danvers State Hospital in 1988. From detox, claimant went into a halfway house. He remained there for approximately one month and then returned to live at his parents home in May 1988. Claimant since has moved to a rooming house. Also during 1988, after leaving the halfway house, claimant again worked for some months as a deli-man.

As for his drinking problem, claimant stated that he had been sober for about eighteen months, but in May 1989 was arrested for driving while intoxicated. He periodically had attended AA meetings in the past and recently had started going to meetings twice a week. In addition to problems with alcohol, claimant described himself as having problems dealing with

authority and with interpersonal relationships. He reacts badly to stress, especially when it arises in the course of interpersonal disagreements. He usually responds to these situations with outbursts of temper. At the time of the hearing, he was not receiving treatment for his emotional problems. However, from May to August 1988, he had participated in a sobriety group and in individual psychotherapy at the Psychology Center.

Claimant testified that he was on general relief due to his allergies and the eczema on his hands. He stated that he has sores on his hands which are worsened when he scratches them. The medication, he averred, did not prevent the itching; when he is nervous the eczema is exacerbated. He also stated that he suffered from gout in his right foot which results in swelling. He alleged that his circulation problems additionally resulted in the swelling of both of his legs and ankles. This results in his only being able to stand for one-half hour at a time. The gout, he stated, was currently under control. He is allergic to dust and detergents which, along with the eczema on his hands, prevents him from working as a cook.

The only treatment claimant was receiving at the time of the hearing was from a Dr. Bixby. Claimant stated that he was seeing Dr. Bixby once every two weeks for allergy shots. He began seeing Dr. Bixby when he was released from the halfway house. According to claimant, Dr. Bixby's medical testimony had formed the basis upon which he was awarded general relief. In addition to treating his allergies, claimant testified that Dr. Bixby also follows the condition which results in the swelling of claimant's legs and his high blood pressure. It is unclear from claimant's testimony exactly what other medical conditions were being treated by Dr. Bixby.

When the ALJ first became aware that the record did not contain any information or reports from Dr. Bixby, he stated,

> So we don't have anything from him so we're certainly going to get it. We'll get a slip from you before you go to give us permission to get it. We'll maybe look up his address to make sure we get the right one before we do it also.

The ALJ repeated his intention to obtain Dr. Bixby's records on two more occasions during the hearing.

### B. *The Medical Evidence*

Records from Lawrence General Hospital indicate that claimant was seen on February 17, 1988 for swelling and pain in his right foot. An x-ray revealed a fracture of the ankle joint and deformity of the great right toe. The diagnosis was osteoarthritis. Claimant also was tested for allergies. A note dated June 7, 1988 indicates that claimant tested positive for allergies to chocolate, egg whites and peanuts. The record goes on to reveal that claimant was given allergy shots in 1988 on June 7, June 21, July 19, August 2, August 16, and September 20.

Records from the Psychology Center include an evaluation performed on May 5, 1988. It noted that claimant was referred by the halfway house. Claimant was described as having extreme eczema on his hands, arms and face. He presented as an angry, mistreated and misunderstood person who always feels on the edge of resuming alcohol consumption. The treatment goals were: (1) maintaining sobriety and good physical health; (2) keeping anger from disrupting relationships; and (3) maintaining steady employment. A transfer summary described claimant as having kept sober while holding a full-time job. He was noted as having increased his insight into his interpersonal style, especially in regard to how his anger affected his relationships. The last record is a utilization review/treatment plan dated August 12, 1988. This report noted that claimant was not attending AA on a regular basis and had had two drinks in three months. It described claimant's interpersonal style as combative. It recommended one to two years of treatment.

In October 1988, Dr. Barbara Sheedy, a clinical psychologist, evaluated claimant. She described him as socially appropriate. His speech and language were normal. He followed simple directions well, was oriented and hard working. His affect and mood

were unremarkable. Dr. Sheedy described claimant as "very motivated" to keep sober. She stated that claimant's fine motor control was below normal limits. His IQ was in the low average range. Most of his performance skills were within the borderline to low average range. However, in regard to object assembly his skills were in the retarded range. She stated that claimant appeared to have suffered mild organic brain damage secondary to his alcohol use. She concluded that claimant "would have difficulty in working ... with any degree of speed on tasks requiring visual motor coordination." She believed claimant was motivated, could follow simple instructions and might benefit from rehabilitation services. Her diagnoses were mixed organic brain syndrome, alcohol dependence (in remission) and dependent personality disorder. Dr. Sheedy did not complete a psychiatric review technique form.

Also in October 1988, Dr. Joel Epstein, a rheumatologist, examined claimant. In a short report, Dr. Epstein described claimant as having "[s]evere eczema with scaling and thickening of skin and some areas of skin breakdown in his hands...." The diagnoses were "severe eczematous dermatitis of the hands, mildly out of control blood pressure, and a history of alcoholism." An x-ray revealed cardiomegaly—an enlargement of the heart. Dr. Epstein did not complete a residual functional capacity form ("RFC").

The record finally contains reports of three nonexamining consultants. On October 24, 1988, a psychiatric review technique form was completed. Claimant's impairment was listed as not severe, although he was diagnosed as having a personality disorder and a substance addiction disorder. A second psychiatric review technique form was completed on January 12, 1989. This evaluator believed that a severe impairment was present which required an RFC. On the first page of the form, section 12.05 (mental retardation) was checked as being present, although in the specific portion of the form dealing with this category the evaluator checked the box indicating that there were no signs of this condition. Under section 12.08 (personality disorders),

the evaluator found claimant to have pathologically inappropriate hostility or suspiciousness with pathological dependence, passivity and aggression. The evaluator found no signs of a substance abuse disorder on the ground that claimant's alcoholism was in remission. Under the "B" criteria, the evaluator found slight restrictions in activities of daily living and moderate difficulties in social functioning. He found that claimant seldom experienced difficulties in concentration and never suffered episodes of deterioration at work.

This evaluator also completed an RFC. Claimant was described as having moderate limitations in understanding, remembering and carrying out detailed instructions. His personality disorder further resulted in moderate limits on his abilities to deal appropriately with the public, to accept instruction and criticisms from supervisors, to get along with coworkers without disturbing them and to maintain socially appropriate behavior.

Two physical RFCs were completed. The first report, dated November 1, 1988, indicated that claimant can sit, stand and/or walk up to six hours in an eight-hour workday. He had the maximum ability to lift up to 20 pounds and could frequently lift or carry up to 10 pounds. Claimant had some limits (undefined by the evaluator) in his ability to push or pull. No other physical limitations were noted. As for environmental restrictions, claimant was found to need to avoid contact with chemicals and occupations involving frequent washing. The second RFC, dated January 17, 1989, found the same sitting, standing and walking capacities, but found no limit on claimant's abilities to lift, carry, push or pull. This evaluator noted that claimant should avoid factors that caused his eczema.

### C. The ALJ's Decision

Using the Medical–Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2 (the "Grid") as a framework, the ALJ determined that claimant was not disabled. He first reviewed all of the medical evidence—both prior to and after the onset

date alleged in the current application. He found that there was documentary evidence of severe atopic dermatitis, hypertension with left ventricular strain, mild osteoarthritis, a history of gout (not recently active), alcohol dependence (in remission), mild organic brain damage and a dependent personality disorder. The ALJ concluded that none of claimant's impairments met any of the conditions contained in 20 C.F.R. Part 404, Subpart P, App. 1 (the "Listings").

Specifically relevant to this appeal is the ALJ's determination that claimant's atopic dermatitis—his eczema—did not meet Listing 8.05. To meet this listing, a claimant must have "extensive lesions, including involvement of the hands or feet which impose a marked limitation of function and which are not responding to prescribed treatment." The ALJ specifically found that claimant's eczema responded to treatment and that there was minimal restriction in his abilities to use his hands and feet.

In reaching this conclusion, the ALJ relied, in part, on medical evidence from 1982–1985. Most of these records were submitted by claimant's then treating physician, Dr. Ceplikas. His reports indicate that claimant began suffering from eczema at age 2 and that the condition had worsened in the late 1970s and early 1980s. Notes from 1982 stated that claimant's eczema would flare up for four to five days, accompanied by limited movement in claimant's fingers due to swelling, stiffness and pain; claimant then would be free of symptoms for 10 to 15 days. Although medication was helpful, claimant's prognosis was "fair." In 1983, Dr. Ceplikas noted that the eczema continued to worsen in spite of dietary restrictions and steroids. In 1985, Dr. Ceplikas stated that claimant's eczema was affecting both hands with *"marked excoriation and scaling."* Although medication improved his condition, it still was described as "bad."

The ALJ determined that claimant's skin problems, dermatitis and mild heart disease resulted in some exertional impairments. He stated that claimant occasionally could lift and carry up to 20 pounds, but that given the swelling in his lower extremities, he could not walk or stand the six hours necessary for the performance of the full range of light work. The ALJ discredited claimant's testimony as to the limitations in standing to which he had testified at the hearing. The ALJ decided instead that claimant could stand and walk up to a total of two to four hours in an eight-hour work day. He also decided that claimant's manual dexterity was not "markedly limited." Thus, taking into account the above exertional limitations, the ALJ decided that claimant could perform the full range of sedentary work and "a significant number of jobs" involving light work.

The ALJ next addressed claimant's mental impairments and found that they did not meet any of the Listings. He then decided that the combined effects of claimant's alcoholism, organic brain syndrome and dependent personality disorder resulted in only slight restrictions in daily living activities, social functioning and ability to concentrate; there were one or two documented episodes of deterioration at work or in work-like settings. The ALJ also found that claimant had moderate limitations in his abilities to deal with the public, co-workers and supervisors.

The ALJ then concluded that claimant's impairments prevented him from returning to his past relevant work. He next addressed the question whether claimant could perform other work existing in significant numbers in the national economy. In answering this question in the affirmative, the ALJ first stated that except for the eczema, claimant's conditions were well-controlled and that there were no neurological deficits and no significant limitations on the use of claimant's arms, hands, legs or feet. As for the eczema, the ALJ noted that there was some question whether claimant was following the prescribed treatment. The ALJ noted claimant's complaints of heat intolerance, extreme itchiness and psychosomatic exacerbations of his eczema. He decided, however, that claimant's complaints of pain and restrictions in movement due to the above symp-

toms were not credible to the extent alleged.

In addition to the exertional and nonexertional impairments described, *supra,* the ALJ concluded that claimant's ability to engage in the full range of sedentary work and in a significant number of jobs involving light work was further limited by the need to avoid chemicals, detergents and other substances likely to cause rashes. The ALJ resolved that

> recent medical examiners have been unable to find sufficient objective clinical evidence which would preclude involvement in all forms of substantial gainful activity. The claimant's own descriptions of daily activities, and his involvement in a number of work efforts during the period he claims he was disabled are also inconsistent with inability to perform these work activities. In general, his response to medical treatment has been favorable, and it appears that ongoing aggravation of his problems, particularly his skin disorder, is largely attributable to willful acts on his part.

Finding that claimant's nonexertional limitations did not significantly erode the occupational base at the sedentary level of work, the ALJ used Grid rules 201.27, 201.28 and 201.29 of Table No. 1 as a framework and found claimant not disabled. He particularly noted that sedentary factory jobs, especially in the electronics industry, would be appropriate for an individual with claimant's limitations.

### D. *The District Court Decision*

The district court upheld the Secretary's decision. It first determined that claimant's waiver of the right to have counsel at the hearing had been made knowingly and intentionally. The court then found that, in any event, claimant had not been prejudiced by the lack of counsel. Specifically, it rejected claimant's assertion that the ALJ should have obtained, as he said he would, the reports from Dr. Bixby. The court determined that Dr. Bixby's treatment consisted of giving claimant shots and that the record contained information from other sources such as Dr. Ceplikas

and the reports of various consultants which adequately explored claimant's allergies and dermatitis.

The district court then rejected claimant's argument that his eczema met Listing 8.05. To reach this result, it relied primarily on medical reports covering the time period *prior* to the onset date alleged in the current application. From this evidence and from the report of the physician who consultatively examined claimant in 1988, the court agreed with the ALJ that claimant's eczema did respond to treatment. The court also found that these same records provided support for the conclusion that claimant's eczema did not impose a "marked limitation" on the use of his hands and for the determination that the eczema would not interfere with claimant's ability to work.

The court last addressed claimant's assertion that the testimony of a vocational expert was required. It first acknowledged that the Grid was not dispositive where a claimant's strength limitations were also complicated by nonexertional impairments. The court, however, found substantial evidence to support the ALJ's conclusion that claimant's non-strength limitations reduced only slightly the full range of work claimant could perform. Thus, the court concluded, the use of the Grid as a framework for decision did not require a remand.

### III. DISCUSSION

#### A. *Use of the Grid*

We first note that at this stage of the sequential process prescribed by 20 C.F.R. §§ 405.1520 and 416.920, the burden is on the *Secretary* to demonstrate that there are jobs in the national economy that claimant can perform. *See Ortiz v. Secretary of Health and Human Services,* 890 F.2d 520, 524 (1st Cir.1989). Where a claimant's impairments involve only limitations in meeting the strength requirements of work, the Grid provides a "streamlined" method by which the Secretary can carry this burden. *Ortiz,* 890 F.2d at 524; *Sherwin v. Secretary of Health and Human*

*Services,* 685 F.2d 1, 4 (1st Cir.1982), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). Where a claimant has nonexertional impairments in addition to exertional limits, the Grid may not accurately reflect the availability of jobs such a claimant could perform. *Ortiz,* 890 F.2d at 524; *Gagnon v. Secretary of Health and Human Services,* 666 F.2d 662, 665 n. 6 (1st Cir.1981). The question whether the Secretary may rely on the Grid in these kinds of situations depends on whether claimant's nonexertional impairment "significantly affects [a] claimant's ability to perform the full range of jobs" at the appropriate strength level. *Lugo v. Secretary of Health and Human Services,* 794 F.2d 14, 17 (1st Cir.1986) (per curiam); *Ortiz,* 890 F.2d at 524. If the occupational base is significantly limited by a nonexertional impairment, the Secretary may not rely on the Grid to carry the burden of proving that there are other jobs a claimant can do. *Id.* Usually, testimony of a vocational expert is required. *Id.*

■ In *Ortiz,* we clarified an exception to the above rule of thumb. We stated,

If a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability. Yet the more that occupational base is reduced by a nonexertional impairment, the less applicable are the factual predicates underlying the Grid rules, and the greater is the need for vocational evidence.

*Id.* (footnote and citations omitted).

■ In the case at hand, the ALJ concluded that claimant's nonexertional impairments—eczema, allergies and mental problems—did not reduce claimant's ability to perform most jobs at the sedentary level. This conclusion does not take into account the finding by Dr. Sheedy that IQ testing revealed that claimant's ability to assemble puzzle pieces accurately and quickly was within the "retarded range." That is, his skills in object assembly were "particularly poor." Dr. Sheedy specifically referred to the effect of the above limit

on work-related activities when she stated that claimant would have difficulty in "working ... on tasks requiring visual motor coordination."

The use of the hands to work with small objects is a nonexertional impairment. Social Security Ruling 83–14 (Capability to Do Other Work—the Medical–Vocational Rules as Framework for Evaluating a Combination of Exertional and Nonexertional Impairments), at 72 (West's Supp.1991) ("SSR"). "Most sedentary jobs require good use of the hands and fingers." *Id.* at 73. A finding of a significant limitation in bilateral manual dexterity could, in fact, warrant a finding of "disabled." *See* 20 C.F.R. Part 404, Subpart P, App. 2, § 201.-00(h). Most unskilled sedentary work requires the use of the fingers for fine movements such as picking, pinching, holding, grasping and turning. SSR 85–15 (Capability to do Other Work—The Medical–Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments), at 422 (West's Supp.1991). Where such a limitation exists, the differing degrees of losses and their effects on the occupational base often will require the assistance of a vocational expert. SSR 85–15, at 422–23.

Dr. Sheedy's report provides objective medical evidence that claimant's manual dexterity is quite limited. This evidence is uncontradicted by anything else in the record. An "ALJ is simply not at liberty to substitute his own impression of an individual's health for uncontroverted medical opinion." *Carrillo Marin v. Secretary of Health and Human Services,* 758 F.2d 14, 16 (1st Cir.1985) (per curiam); *Nieves v. Secretary of Health and Human Services,* 775 F.2d 12, 14 (1st Cir.1985) (ALJ not at liberty to discredit IQ scores where such test results are the only evidence on the point before the ALJ). The ALJ's conclusion that claimant retains the capacity to perform the full range of sedentary work in light of the above evidence is not supported by the record. As for the specific finding that claimant could perform jobs in the electronics industry, there is no evidence that such jobs would not involve bilateral manual dexterity. In this respect,

we believe that the ALJ went beyond the proper scope of administrative knowledge. We conclude that reliance on the Grid was unwarranted and that vocational expert testimony is required.

## B. *The Development of the Record*

Assuming for purposes of this appeal that claimant knowingly and intelligently waived the right to be represented by counsel at the hearing, we still are persuaded that under the circumstances the ALJ had a duty to develop the record more fully. Specifically, he had an obligation to explore the current state of the severity of claimant's eczema. The only medical evidence concerning this impairment consists of brief hospital records indicating that claimant received allergy shots in 1988, a cursory report from a consulting rheumatologist which described claimant as having "severe eczema" on his hands, and two Residual Functional Capacity forms completed by nonexamining physicians.[1] Conspicuously absent are any records from Dr. Bixby, claimant's treating physician.

■ Because Social Security proceedings are not adversarial in nature, *see Currier v. Secretary of Health, Education and Welfare*, 612 F.2d 594, 598 (1st Cir.1980), the Secretary had a duty "to develop an adequate record from which a reasonable conclusion can be drawn." *Carrillo Marin*, 758 F.2d at 17. We have stated,

> In most instances, where appellant himself fails to establish a sufficient claim of disability, the Secretary need proceed no further. Due to the non-adversarial nature of disability determination proceedings, however, the Secretary has recognized that she has certain responsibilities with regard to the development of evidence and we believe this responsibility increases in cases where the appellant is unrepresented, where the claim itself seems on its face to be substantial, where there are gaps in the evidence necessary to a reasoned evaluation of the claim, and where it is within the power of

the administrative law judge, without undue effort, to see that the gaps are somewhat filled—as by ordering easily obtained further or more complete reports or requesting further assistance from a social worker or psychiatrist or key witness.

*Currier*, 612 F.2d at 598 (citations omitted).

■ Under 42 U.S.C. § 405(g), a remand to the Secretary is appropriate where "the court determines that further evidence is necessary to develop the facts of the case fully, that such evidence is not cumulative, and that consideration of it is essential to a fair hearing." *Evangelista v. Secretary of Health and Human Services*, 826 F.2d 136, 139 (1st Cir.1987). There also must exist good cause for the failure to submit the new evidence to the ALJ. *Id.* at 141. It is plain that reports of Dr. Bixby's treatment of claimant would not be cumulative or irrelevant. Rather, such evidence would fill a gap in the record. Other than the brief Lawrence General Hospital notes there is no evidence from a treating source concerning the extent of claimant's eczema and how it presently responds to treatment. Records of treatment during the period of time covered by the present application also are material because almost every observer of claimant's eczema has described it as "severe." Such a description brings into question not only whether claimant's eczema presently meets Listing 8.05, but whether in addition to the limits noted by Dr. Sheedy, *supra*, claimant's eczema also shrinks the range of sedentary work he can do.

Finally, good cause exists for a remand in this case. First, claimant was unrepresented at the hearing. This fact strengthens the ALJ's obligation to explore the issue. *See Deblois v. Secretary of Health and Human Services*, 686 F.2d 76, 81 (1st Cir.1982); *cf. Currier*, 612 F.2d at 598. Second, the ALJ specifically had informed claimant that he would arrange to obtain Dr. Bixby's records. Finally, unlike the

---

1. We note that the *examining* consultant did not fill out an RFC, a practice we already have criticized. *See Rivera–Torres v. Secretary of Health and Human Services*, 837 F.2d 4, 6 (1st Cir.1988) (per curiam) (the Secretary should have a consulting doctor complete an RFC).

situation in *Deblois* and *Currier,* the burden of proof in this case had shifted from claimant to the Secretary to show that there exist other jobs claimant could perform.

## IV. CONCLUSION

The judgment of the district court is vacated and the case is remanded to the district court with directions to enter an order remanding to the Secretary for further proceedings not inconsistent with this opinion.