Thompson v. Shalala                      CV-94-88-B      05/02/95
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE


Amber Thompson

        v.                                      Civil No. 94-88-B

Donna E. Shalala, Secretary of
        Health and Human Services


                          **O R D E R**

        Amber Thompson challenges the decision by the Secretary of

Health and Human Services to deny her disability insurance and

supplemental security income benefits.  Thompson contends that

the Administrative Law Judge ("ALJ") agreed to suspend her

benefits hearing to allow her to submit additional evidence, and

then improperly closed the record without notice and without

first allowing Thompson's counsel to cross-examine the vocational

expert further in light of the evidence submitted after the

hearing.  Thompson also argues that the record does not support

the ALJ's decision.  Because the ALJ did not err in not reopening

the hearing and the record contains substantial evidence to

support the decision, I affirm.

## BACKGROUND

Amber Thompson filed concurrent applications for supplemental security income and disability insurance benefits on November 18, 1991, alleging disability due to asthma and depression related to transsexualism since November 5, 1990. At the time of her application for disability benefits on November 18, 1991, she was thirty-eight years old. She had a high school education with additional vocational training in electronics. Following denial of her application and request for reconsideration, she filed for an administrative hearing, asserting an additional impairment due to knee pain. A hearing was held on June 16, 1993.

Thompson's last gainful employment, as a motel manager, ended on November 5, 1990, when the motel went bankrupt. Prior to that time, she had worked for three and a half years as a solderer and had been trained in still photography while serving in the army. Thompson testified that at the time of the hearing in June 1993, and for the year and a half prior to that time, she had been most disabled from work by her knee pain. She testified that she experienced constant discomfort due to knee pain.

Thompson's medical records during the period between November 1990 and the hearing in June 1993 show that she was

treated several times for complaints of pain in her knees.  Each
doctor reported that she had a reasonably good range of motion
and that her knees showed no signs of inflammation or swelling.
In her most recent evaluation in March 1993, the doctor noted
that her reported pain was somewhat out of proportion to the
physical findings, but suggested an orthopedic examination to
check for arthritis and ligament damage.

Thompson also testified that she experienced episodes of
asthma from exertion or emotional stress and that she took
medication, Alupent, as necessary to control her asthma.  She
submitted the results of a pulmonary function test she took in
January 1992 that reported as a diagnostic conclusion that the
tests indicated a moderate restriction which was markedly
improved by using a bronchodilator.  In November 1992, Thompson's
treating doctor concluded that her asthma was stable.

Thompson was first diagnosed with dysthymia[1] related to
transsexualism[2] in 1984.  After several years of not being

---

[1]  Dysthymia is defined as "[a]ny disorder of mood."
Stedman's Medical Dictionary 481 (25th ed. 1990).

[2]  Transsexualism is defined as: "The desire to change one's
anatomic sexual characteristics to conform physically with one's
perception of self as a member of the opposite sex."  Id. at

treated, Thompson again sought treatment at the Nashua Community Council ("NCC") in June 1990 to satisfy her treating doctor's requirement that she receive psychotherapy as a prerequisite for prescribing hormones for her transsexual lifestyle and to relieve stress and depression.  The primary therapist recorded his diagnostic impression as (1) adjustment disorder, depressed mood; (2) dysthymic disorder; and (3) transsexualism.  Her records of psychotherapy and psychological evaluation during the period shows that her primary purpose for engaging in psychotherapy was to fulfill the prerequisite for obtaining hormone treatment and to be evaluated for disability eligibility.  In the most recent evaluations in March 1993, the diagnosis remained essentially the same, dysthymic disorder, transsexualism, and a possible personality disorder.  The psychotherapist found that Thompson did not present a depressive picture and that she was well oriented with good memory.  The psychiatrist noted that she was lucid and well-organized without thought disorder and that she should be encouraged to regain employment.

Thompson testified that her depression made it harder to care about doing anything.  She also testified that she did not

_____

1625.

4

take, and did not want to take, antidepressant medication. Despite the physical and emotional problems she described, she testified that she could do the motel manager's job, which she held until November 1990, as long as she did not have to do any maid service. The ALJ posed hypotheticals to the vocational expert limiting functional capacity to light work with additional restrictions reflecting Thompson's testimony about her capacity for walking, standing, sitting, kneeling, and adding mild depression.

Because Thompson's attorney anticipated collecting and submitting additional evidence, the ALJ agreed to keep the record open to receive additional records. Thompson's attorney and the ALJ discussed the possibility of new issues arising from additional records that would require further questioning of the vocational expert. While the record remained open, Thompson's attorney sent additional medical and psychiatric records for consideration by the ALJ.

The ALJ issued his decision denying Thompson benefits on September 13, 1993. He found that Thompson met the disability insured status on the date of her alleged disability; that she had not engaged in substantial gainful activity since that date; that her claimed impairments, while severe, were not listed in or

5

medically equal to an impairment listed in the regulations. He determined that Thompson's testimony at the hearing about her degree of pain was not entirely credible and that the evidence showed that she had capacity for work activity in the light range. He found that her capacity to perform light work was limited by exertional restrictions, and non-exertional restrictions from bending, stooping, climbing, crawling, no exposure to asthma irritants, and a psychiatric limitation due to mild depression. Based on those findings, the ALJ concluded that Thompson was able to return to her past relevant work as a still photographer or a motel desk clerk or manager. Consequently, the ALJ decided that Thompson was not disabled. Thompson appealed to the Appeals Council, who declined review, and Thompson appealed to this court.

## STANDARD OF REVIEW

After a final determination by the Secretary and upon request by a party, this court is authorized to review the pleadings and the transcript of the record of the proceeding, and enter a judgment affirming, modifying, or reversing the Secretary's decision. 42 U.S.C.A. § 405(g). The court's review is limited in scope, however, as the Secretary's factual findings

6

are conclusive if they are supported by substantial evidence. Id.; Ortiz v. Secretary of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). The Secretary is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. Id. Therefore, the court must "'uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Secretary's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health & Human Serv., 647 F.2d 218, 222 (1st Cir. 1981). However, if the Secretary has misapplied the law or has failed to provide a fair hearing, deference to the Secretary's decision is not appropriate, and remand for further development of the record may be necessary. Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 644 (2d Cir. 1983). See also Slessinger v. Secretary of Health & Human Servs., 835 F.2d 937, 939 (1st Cir. 1987).

## DISCUSSION

On appeal, Thompson contends that the ALJ erred in closing the record without notice, without receiving all the necessary evidence, and without allowing her attorney to question the vocational expert in light of the evidence that was submitted

7

after the hearing.  Thompson concludes that the ALJ's actions deprived her of a fair hearing.  She also challenges the sufficiency of the evidence to support the ALJ's decision denying her benefits.[3]  I address each issue separately.

## A.  **Fair Hearing**

In every disability proceeding, the ALJ has a duty to develop a full and fair record on which to make a determination. 20 C.F.R. §§ 404.944, 416.1444 (1994).  The ALJ has a duty to obtain additional evidence if necessary to fill a gap in the record.  Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991). Also, the ALJ may stop the hearing temporarily and reopen it at a later time if he or she believes that material evidence is missing.  20 C.F.R. §§ 404.944, 416.1444.  A claimant is entitled by due process to a fair hearing including an opportunity for cross-examination.  Tanner v. Secretary of Health and Human Servs., 932 F.2d 1110, 1112 (5th Cir. 1991); see generally Richardson v. Perales, 402 U.S. 389, 402 (1971).  Thus, a question of due process might arise if the ALJ had relied on a

---

[3]  Thompson focuses on disabilities due to knee pain and depression, but no longer pursues her claim based on asthma.  The medical records support the ALJ's conclusion that Thompson's asthma was sufficiently controlled by medication not to be disabling.

8

report or evidence unknown to Thompson without providing an opportunity to refute the evidence or cross-examine the source of the report. See, e.g., Allison v. Heckler, 711 F.2d 145, 146-47 (10th Cir. 1983). Thompson acknowledges that the ALJ offered her attorney an opportunity to cross-examine the vocational expert at the hearing. She argues, however, that the ALJ suspended the hearing to get additional evidence and agreed either to resume the hearing or to schedule a consultative psychiatric examination and allow her attorney to cross-examine the vocational expert at a later date. Then, Thompson argues, after she submitted additional medical evidence, the ALJ closed the record and issued his decision without further notice and without allowing her attorney cross-examination. I reject these claims because the hearing transcript does not support Thompson's interpretation of the ALJ's remarks.

After the vocational expert's testimony, the ALJ and Thompson's attorney discussed submitting additional evidence for the record as follows:

> ALJ: Obviously, attorney Kelly, if we receive any additional reports concerning any, any psychiatric issues, we do not have those for purposes of the hypothetical that's been given. Do you have any questions of, of the vocational expert?

> ATTY: I'd like to reserve those until I get the, the

9

psychiatric.

ALJ:  What we'll do is in the event -- I think that would be appropriate.  What I would ask you do, I'd ask you to keep your records [vocational expert] thank you for testifying.  And in the event that any additional reports are received that requires a consideration of different factors in a hypothetical, then again we could pose them either by way of interrogatories or it may be necessary to, to reschedule dependent upon the nature of the, of the additional questions that may be raised.  Is there anything you'd like to say in closing, attorney Kelly?  Do you wish to leave the record open until we receive this additional --

ATTY:  Yes, Your Honor. And then if I could comment in writing.

ALJ:  I certainly will leave the record open.  How much time do you think you'll need for the additional --

ATTY:  Thirty days.

ALJ:  The -- now, what specifically are we, are we anticipating that we're going to receive?

ATTY:  I'm going to get -- attempt to get an RFC-mental from Joyce Eldridge -- treating psychiatrist is at the Community Council.  There also appears to have been an APTD psychological evaluation done separate and distinct from that of the Community Council so I'm going to try to get that.  Dr. Wagner's orthopedic evaluation which was done for city welfare.  And then I'm going to contact Dr. Eisen's office since he has the longitudinal --

ALJ:  Well, I'm considering whether it would be appropriate at this time to consider the, consider the, the need to try to find a consultative examiner who has had a history of treatment, consider him to be an appropriate person to conduct a current evaluation and to provide a, provide a current consultative exam as opposed to using a stranger to do the function --

10

> ATTY:  That certainly would be preferable, and if the Court felt that was advisable I would, I would certainly request it.
>
> ALJ:  What I will do is I'll leave the record open and if, if I feel that that is necessary when you have submitted additional documents as soon as I receive those documents, it may require, it may require some additional delay, would definitely require additional delay, I'll leave the, the issue of closing the record when it's appropriate at that time.

At the end of the hearing, the ALJ explained to Thompson what he anticipated would happen next:

> ALJ:  . . . your attorney is going to be submitting additional evidence as he receives it.  At some point in time the record will close.  And it may be that I, I need even additional evidence after the documents that he submits which may require even a more substantial delay by, by having an examination done.  In any event, at some point in time the record closes.  When it does, I review all the evidence at that time, I render a decision. . . . So, if there's nothing further I reserve right of counsel to, to make arguments in writing when the additional documents are in.

Although the conversation is not as well-focused as one might wish, the ALJ's intent is sufficiently clear.  It is apparent that the ALJ agreed to leave the record open to receive additional evidence from Thompson's attorney who asked for thirty days to submit the documents.  The ALJ reserved an opportunity for Thompson's attorney to make arguments in writing when he submitted the additional documents.  The ALJ intended to review the submitted documents and, if necessary, he would consider a

11

consultative psychiatric examination of Thompson, or if new psychiatric issues were raised by the evidence, he would order further questioning of the vocational expert. In other words, the ALJ anticipated making further decisions about whether additional evidence would be necessary depending on the nature of the evidence that was submitted by Thompson. The ALJ did not commit to a psychiatric examination of Thompson, nor did he continue the hearing pending receipt of the additional records.

After the hearing, Thompson submitted her psychiatric and medical treatment records from the Community Council dated 7/9/90 to 7/1/92 and 3/23/93 to 4/22/93 and from the Hitchcock Clinic dated 10/22/92 to 4/28/93.[4] The ALJ rendered his decision on September 13, 1993, almost three months after the hearing. The ALJ did not ask for a consultative examination or provide for additional examination of the vocational expert.

The psychiatric records submitted after the hearing show

[4] Thompson's attorney submitted more medical records to the Appeals Council after the ALJ issued his decision. Although those documents are included in the record here, evidence that was submitted only to the Appeals Council, who declined to review Thompson's case, is not considered as part of the record before this court on appeal from the Secretary's decision. See Eads v. Secretary of Secretary of Health & Human Servs., 983 F.2d 815, 816-17 (7th Cir. 1993).

that Thompson suffered from dysthymic mood disorder due to transsexualism with mild depression and from intermittent knee pain caused by osteoarthritis. Her psychiatric evaluations from March and April 1993 diagnosed dysthymic disorder and transsexualism, and note that Thompson was lucid, without thought disorder, manifesting reasonable judgment and that she did not present a depressive picture. In the most recent medical report from March 1993, Thompson told the doctor that she could walk for one-half to one mile at a time, but that she was using a cane to walk. The doctor found that she had a reasonably good range of motion with some pain and stiffness, and that her reported pain was somewhat out of proportion to the physical findings. He nevertheless concluded that there was a significant possibility of arthritis.

The records submitted after the hearing are consistent with the medical and psychiatric evidence presented to the ALJ at the hearing. The original evidence provided at the hearing made the same psychiatric and physical examination diagnoses. Thus the additional evidence submitted by Thompson's attorney did not raise any new issues that required further evidence, or different hypotheticals for the vocational expert. In addition, the testimony and records provided a complete picture through the

13

application period of Thompson's claimed impairments and treatment. Compare Heggarty, 947 F.2d at 997 (holding that ALJ had a duty to further develop the record if additional evidence is necessary to make a reasonable decision particularly when claimant was unrepresented and the ALJ told claimant that he would obtain records). Because Thompson submitted additional medical and psychiatric records, and her attorney could have submitted additional arguments in writing with the records, she was not prejudiced by a decision based upon new, unknown, and unchallenged medical evidence. Compare Allison, 711 F.2d at 146-47 (remanding because determination based on medical report received after hearing when claimant had no notice of report, no opportunity to cross-examine doctor, and no opportunity to offer evidence in rebuttal). Due process did not require any further development of the record in this case.

Consequently, the ALJ did not err as a matter of law by not reopening the hearing for further evidence or for cross-examination of the vocational expert.

### B. Sufficiency of the Evidence

The ALJ uses a sequential five-step analysis to determine whether a claimant is disabled in social security cases. 20 C.F.R. §§ 404.1520, 416.920 (1994); Goodermote v. Secretary of

Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).  The ALJ found that Thompson was able to return to her previous relevant work as either a photographer or a motel manager or desk clerk.  Thus, the ALJ determined that Thompson was not disabled at step four of the analysis.  Thompson contends that the evidence in the record did not support the ALJ's determination.

### 1.  Depression

First, Thompson argues that the ALJ's reliance on her past relevant work was misplaced.  Thompson notes that the vocational expert testified that she could not perform either of her past relevant jobs if she suffered from a moderate concentration deficit due to depression.  Thompson, however, has not pointed to any evidence in the record that demonstrates that she suffered from a moderate concentration deficit at the time of the hearing or at any relevant time prior to the hearing.[5]

Instead, her psychiatric records show that while she suffered from dysthymic mood disorder due to transsexualism and some depression related to her inability to find employment, she

---

[5]  Thompson bore the burden of proving that she was impaired and that her impairments  prevented her from performing her previous work.  See Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985).

15

was not disabled in the opinion of the examining psychiatrists. The psychiatric records describe Thompson as lucid, with good concentration and memory, reasonable judgment, and depression at a level that would not prevent consistent work.  In addition, Thompson acknowledged and the records confirm that she consistently refused anti-depressant medication that was suggested by her therapists.  Several therapists report that Thompson used therapy sessions only as a means for obtaining hormone treatments to maintain her transsexual lifestyle, that her depression was primarily related to her lack of success in obtaining employment, and that she had a manipulative quality of trying to avoid her current situation by an award of long-term disability.  Finally, Thompson testified that her problem with depression made it difficult for her to care about doing anything, but she also testified that the pain in her knees was the primary reason that she was not working.

The ALJ found that Thompson's work capacity was limited based upon a diagnosis of mild depression.  Relying on the testimony of the vocational expert responding to a hypothetical adding a slight limitation in concentration due to depression, the ALJ determined that Thompson could return to her past relevant work as a motel clerk or manager or a photographer.

16

Substantial evidence at the hearing supports the ALJ's determination, and there was no evidence that Thompson suffered from a more severe impairment in concentration.

### 2. Knees

Thompson also contends that the ALJ improperly evaluated the medical evidence pertaining to her impairment due to knee pain. She argues that the records of her examinations by Dr. Jesse Wagner between November 1992 and March 1993 show that medical evidence existed to support her subjective complaints of knee pain. I disagree.

Subjective complaints of pain are evaluated in light of all of the evidence. 42 U.S.C.A. § 423(d)(5)(A); <u>Avery v. Secretary of Health & Human Servs.</u>, 797 F.2d 19, 23 (1st Cir. 1986). In his final examination note in March 1993, Dr. Wagner reported that Thompson was experiencing severe pain and using a cane but that she could walk for one-half to one mile at a time. He found no swelling, inflammation, warmth or local tenderness in her knees. He also found a good range of motion in her knees with some pain and stiffness in certain motions. He concluded that her reported pain was somewhat out of proportion to the physical findings of the examination, but that a significant possibility of arthritis or ligament damage existed and recommended an

17

evaluation by an orthopedic doctor.

At the hearing in June 1993, Thompson testified that she had stopped riding her bicycle during the winter of 1992 to 1993 because of her knee pain. She also testified that she occasionally did her own laundry and sometimes asked a friend to do it for her. She said that she ate supper at the soup kitchen but that she made some meals in her apartment, did some grocery shopping about once a month, and tried to do her own housekeeping. She testified that stairs or a high curb bothered her knees but that she could walk on a flat surface for twenty to twenty-five minutes and could stand for ten or fifteen minutes. Bending over to pick something up off of the ground and kneeling caused problems with her knees, but she could pick up and carry something weighing no more than twenty pounds. She said that she could sit for forty to forty-five minutes at a time and then could return to sitting after moving around or after taking something for pain.

In the hypothetical to the vocational expert, the ALJ limited Thompson's capacity for work to light work including sedentary work without standing for more than fifteen minutes at a time, walking for no more than twenty-five minutes at a time, sitting for no more than forty-five minutes at a time. The ALJ

18

also required that she have freedom to rest and change position, and that the work be limited as to bending and stooping, and avoid climbing or crawling. These are the restrictions indicated by Thompson's testimony at the hearing. Only when the ALJ added a restriction to only sedentary jobs did the vocational expert rule out Thompson's prior relevant work. Thompson presented no evidence that she would require only sedentary work.

Substantial evidence, including Thompson's testimony, the medical evidence, and the vocational expert's evidence, supports the ALJ's determination that Thompson could return to her past relevant work as a motel clerk or manager, or a photographer. Therefore, the ALJ properly determined that Thompson was not disabled.

## CONCLUSION

For the foregoing reasons plaintiff's motion to reverse and remand (document 11) is denied and defendant's motions to affirm the Secretary's decision (documents 10 and 12) are granted.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

May 2, 1995

19

cc: David Broderick, Esq. AUSA
    Raymond Kelly, Esq.