**Dianna Correll v. SSA**            **CV-01-258-B**     **03/25/02**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Dianna Correll**</u>

    **v.**

<u>**Jo Anne Barnhart, Commissioner,**</u>
<u>**Social Security Administration**</u>

Civil No. 01-258-B
Opinion No. 2002 DNH 071

<u>MEMORANDUM AND ORDER</u>

On November 20, 1995, Diana M. Correll filed concurrent applications with the Social Security Administration ("SSA") for Title II disability insurance benefits ("DIB") and Title XVI supplemental security income ("SSI"). Correll alleged a disability onset date of May 26, 1995. SSA denied her application on April 4, 1996 and again on reconsideration on January 22, 1997. Correll filed a timely request for rehearing and, on September 27, 1997, ALJ Robert Klingebiel held a hearing thereon. On November 28, 1997, the ALJ issued his decision denying Correll's application because she had not demonstrated an inability to perform sedentary work for a continuous 12-month period. Correll appealed, but the SSA denied her request for

review and the ALJ's decision became the final decision of the Commissioner.

Correll brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the denial of her application for benefits. For the reasons set forth below, the ALJ's decision is not supported by substantial evidence. Therefore, I vacate the ALJ's decision and remand the case for further proceedings.

## I. BACKGROUND

### A. Work History

Correll was forty-seven years old when she applied for benefits. She has a high school education and a past work history as a stitcher in the clothing and shoe industries. As previously stated, she alleges an inability to perform basic work activities since May 26, 1995. Correll attempted to return to work in May 1996, but she was able to work for only three weeks. Correll also worked between June 1996 and December 6, 1996, when she was laid off (drawing unemployment benefits until June 1997). She has not engaged in any employment since June 1997.

## B.  Medical Evidence

On June 9, 1995, Correll visited Dr. Mark Fillinger because she was experiencing pain and numbness in her right foot, low back pain, and pain in her hips.  A lower extremity arterial study indicated that Correll was suffering from lower extremity arterial occlusive disease.  Dr. Fillinger suggested that Correll stop smoking, exercise and lose weight before considering more aggressive therapy such as angiography and/or angioplasty.

On July 14, 1995, Correll returned to Dr. Fillinger with additional complaints of pain and numbness in her left thigh and calf.  Angiography conducted on August 4, 1995 established that Correll was suffering from a total occlusion of her right iliac artery and a partial occlusion of her left iliac artery.  After angioplasty and stent replacement failed to alleviate Correll's symptoms, Dr. Fillinger recommended an aortobifemoral bypass.  He then referred Correll to Dr. Samuel Law, a cardiologist, for a preoperative evaluation.

On September 29, 1995, Dr. Lau diagnosed Correll with coronary artery disease (CAD) with angina, severe peripheral vascular disease with occlusion of the right common/external iliac artery, inadequately controlled diabetes, hypertension, and

asthma.  Dr. Lau's treatment plan for Correll's CAD and angina began with obtaining a more accurate picture of her heart via a cardiac catheterization.

On September 12, 1995, John F. Robb, M.D., a cardiologist, performed an outpatient cardiac catheterization.  The results evinced progressive angina and two-vessel coronary disease with diffuse disease in the left anterior descending artery (LAD).  On September 27, 1995, Dr. Lau referred Correll to John Sanders, M.D., a cardiothoracic surgeon, to assess whether she was a bypass candidate.  On October 6, 1995, Dr. Sanders determined that Correll's condition would benefit from coronary bypass surgery.  On October 26, 1995, Dr. Sanders performed coronary bypass surgery on Correll.  She tolerated the surgery well and was discharged on October 31, 1995 in good condition.

On December 29, 1995, Correll returned to Dr. Fillinger for further evaluation of her lower extremity occlusive disease. Although she reported that her angina had improved, she also indicated that she continued to experience pain in her buttocks, thighs, calves, and right foot that caused her to limp after walking short distances.  Dr. Fillinger felt that an aorto-bifemoral bypass would help relieve her thigh and calf pain while

walking, as well as much of her resting right foot pain, but that it would not relieve the pain in her buttocks because of the nature of her iliac disease. Dr. Fillinger also did not think the procedure would do much to relieve her foot pain, which was likely secondary to diabetic neuropathy. On January 2, 1996, Dr. Fillinger performed an aortobifemoral bypass without complication.

On February 5, 1996, Correll visited Diane Zavotsky, M.D., her attending physician. Correll complained about continued hip and leg pain that prevented her from engaging in daily activities such as grocery shopping. She stated that rest only partially relieved her symptoms. On February 7, 1996, Correll saw Dr. Fillinger for a post-aortobifemoral bypass visit. Again she reported generalized pain between her shoulders and hips. Dr. Fillinger opined that the pain was due to some generalized disorder or inactivity. Correll also reported a significant amount of fatigue and depression, but a marked improvement in her walking ability. Specifically, Correll stated that she could climb stairs, walk around her house, and walk from the parking lot to the hospital without limping. Dr. Fillinger estimated

that, with continued improvement, Correll could return to work in four weeks.

During the next six months, Correll returned to Dr. Zavotsky six times with general pain symptoms. Intermittently, Correll complained of pain in her hips, legs, and shoulders; soreness near the incision for her vascular surgery and aching in her lower back. Dr. Zavotsky noted give-away weakness at Correll's shoulder girdle, but felt that it occurred because of pain, not true weakness. Dr. Zavotsky noted that Correll had only a limited range of motion in her right shoulder due to pain that improved over time. Generally, Dr. Zavotsky reassured Correll that her symptoms were musculoskeletal and not caused by her heart or lungs. Dr. Zavotsky referred Correll to Dr. Lin Brown for a rheumatological evaluation.

On September 11, 1996, Correll visited Dr. Robert Zwolak, complaining of abdominal pain and a bulge in her left flank. Dr. Zwolak found that, given her surgical history, the bulge in her incision was normal. On October 16, 1996, Dr. Zavotsky confirmed that delayed gastric emptying caused Correll's reported abdominal

pain.  Dr. Zavotsky recommended weaning Correll off of Darvocet[1] and onto Ultram.[2]

On December 17, 1996, Dr. Fillinger saw Correll for a follow-up evaluation of her aorto-iliac occlusive disease. Correll described a burning sensation in her feet, which Dr. Fillinger attributed to diabetic neuropathy.  He did not think Correll required vascular intervention and recommended that she see a neurologist and/or a pain clinic specialist.

Dr. John Robb saw Correll on March 19, 1997.  Correll complained that since January of 1997, she had been experiencing an increase in her angina when walking up stairs or doing housework with her arms.  She also complained of a shortness of breath upon exertion that seemed to improve with Lasix.[3]  Dr. Robb's impression was atherosclerotic cardiovascular disease with recurrent angina, diabetes with peripheral neuropathy, and severe peripheral vascular disease and abdominal angina.

[1] Darvocet is a centrally acting analgesic. Physician's Desk Reference 1708 (55th ed. 2001).

[2] Ultram is a centrally acting synthetic analgesic. Physician's Desk Reference 2398 (55th ed. 2001).

[3] Lasix, also known as Furosemide, is a diuretic. Physician's Desk Reference 2121 (55th ed. 2001).

At the request of Dr. Zavotsky, Dr. Parker Towle examined Correll on April 3, 1997.  Correll presented him with complaints of pain in her legs, feet, hips, and shoulders.  After examining Correll, Dr. Towle determined that diabetic neuropathy was contributing to her symptoms.  On April 11, 1997, Dr. Towle executed a follow-up nerve conduction study.  The results revealed diffuse sensory motor neuropathy with possible asymptomatic carpal tunnel syndrome.  Dr. Towle provided Correll with an increased dose of Amitriptyline[4] for her neuropathic symptoms and a prescription for Tegretol.[5]

C.  **Evidence as to Functional Capacity**

1.  **Examining Physicians and Occupational Therapist**

On December 16, 1996, Dr. Fillinger wrote to the New Hampshire Department of Education detailing Correll's physical capacities.  He stated that, because of her vascular conditions, Correll could walk short distances but would probably have difficulty walking long distances, climbing stairs or carrying

---

[4]  Amitriptyline, also known as Elavil, is an antidepressant.  Physician's Desk Reference 626 (55th ed. 2001).

[5]  Tegretol is an anti-convulsant.  Physician's Desk Reference 2120 (55th ed. 2001).

any significant weight.  Dr. Fillinger also stated that Correll had chronic peripheral neuropathy due to diabetes and ischemia[6] prior to revascularization, causing her a significant amount of discomfort in her lower extremities and making it difficult for her to get comfortable in any position.  He cautioned that a neurologist could more appropriately delineate her lower extremity limitations.  Dr. Fillinger further stated that Correll had limitations in lifting, carrying, bending, and other significant activities.  Again, he suggested that an expert in physical and rehabilitative medicine could better define these limitations.

Dr. Zavotsky referred Correll to John Lane, an occupational therapist, for a functional capacity evaluation.  On January 23, 1997, Lane evaluated Correll for her physical capacities. Correll walked 1.3 mph with complaints of bilateral hip pain after 90 seconds.  Correll stood for 15 minutes before indicating an increase in pain.  Lane's findings restricted Correll to occasionally climbing stairs and never climbing ladders.  Lane

---

[6] Local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply.  Stedman's Medical Dictionary 894 (26th ed. 1995).

concluded that Correll demonstrated the ability for only sedentary work based on her intolerance to any frequent lifting and inability to stand for extended periods of time.

On August 7, 1997, Dr. Towle evaluated Correll's physical capabilities and concluded that, due to her neuropathy and chest pain, she could lift a maximum of 10 pounds occasionally and 1 pound frequently. He limited Correll's walking to approximately one quarter of a mile. He recognized that her ability to reach and stoop were somewhat limited. On August 11, 1997, Dr. Towle completed a medical assessment of Correll's ability to perform work-related activities. He concluded that Correll could lift 10 pounds occasionally and 1 pound frequently. He determined that Correll could only stand for a total of 1 hour in an 8-hour day and one-half hour without interruption. He determined that Correll should only occasionally (from very little to up to 1/3 of an eight-hour day) climb, balance, or kneel and that she should never stoop, crouch, or crawl. Dr. Towle characterized Correll's ability to reach, handle, feel, push, and pull as slow and uncomfortable.

On August 13, 1997, Dr. Zavotsky completed a medical assessment of Correll's ability to engage in work-related

activities.  Dr. Zavotsky commented that Correll had fairly good control over her diabetes, and that, although she experienced angina and shortness of breath with moderate exertion, medication controlled her symptoms during normal daily activities.  Dr. Zavotsky further concluded, however, that Correll's neuropathic pain was becoming increasingly problematic.  Dr. Zavotsky indicated that Correll could barely squat down and return to a standing position without using her arms for assistance.  She diagnosed Correll with coronary artery disease with class II[7] angina, diabetes with complications of neuropathy and myopathy, peripheral, vascular, and abdominal angina, asthma, and degenerative joint disease of the lumbar spine.  Specifically, Dr. Zavotsky found that Correll could lift up to 15 pounds occasionally and 2 pounds frequently.  She restricted Correll to standing for a total of 3 hours in an 8-hour day, but limited standing to 15-20 minutes without interruption.  Dr. Zavotsky

---

[7] Slight limitation of ordinary activity; for example, angina occurs walking or stair climbing after meals, in cold, in wind, under emotional stress or only during the few hours after awakening, walking more than two level blocks or climbing more than one flight of ordinary stairs at a normal pace and in normal conditions.

asserted that Correll should never stoop, crouch, or crawl; had poor balance; and should only occasionally kneel. Dr. Zavotsky opined that Correll was limited in her ability to reach, feel, push, and pull. She specifically stated that Correll's reaching was impaired by a decreased range of motion in the left shoulder and pain in the midsternum and right rib. She also concluded that peripheral neuropathy impaired Correll's feeling in her hands and feet.

## 2. Non-examining Physician

On April 3, 1996, Dr. Burton Nault completed a residual physical functional capacity assessment of Correll at the request of the SSA. He opined that Correll could carry 20 pounds occasionally and 10 pounds frequently. He determined that she could stand for 6 hours out of an 8-hour work day and sit about 6 hours out of an 8-hour workday. Dr. Nault did not believe that Correll had any push and pull limitations, but he noted that she should avoid repetitive stooping and only occasionally perform other postural activities. Dr. Nault considered Correll to be capable of at least light work, provided that she avoid prolonged ambulation and repetitive bending, lifting, and overhead reaching.

D.  **The ALJ's Decision**

The ALJ applied the five-step sequential evaluation process under which disability applications are reviewed.  See 20 C.F.R. § 404.1520.  The ALJ concluded that Correll had carried her burden at each of the first four steps in the process, but that Correll was "not disabled" because there was no continuous 12 month period when she would have been unable to perform at least sedentary work.  Specifically, the ALJ found that, although Correll had severe impairments including severe cardiac disease, vascular disease, and myofacial pain, she retained the residual functional capacity ("RFC") during the relevant period "to lift and carry 10 pounds...[and] stand and walk for two hours out of an eight hour work day."  While conceding that Correll's "ability to perform all postural activities is restricted," the ALJ, without meaningful elaboration of these non-exertional limitations, also went on to apply the Medical-Vocational Guidelines, also known as the "Grid."  At step five, the ALJ concluded, without calling a vocational expert, that "the claimant has the residual functional capacity to perform a full range of sedentary work which exists in significant numbers in the national economy."

-13-

In reaching his conclusions, the ALJ referenced the functional capacity evaluations performed by John Lane, Dr. Zavotsky, and Dr. Towle and specifically calculated Correll's lifting/carrying and standing/walking abilities. The ALJ commented that, according to Dr. Zavotsky and Dr. Towle, "all postural limitations would be limited," but did not assess the extent of these limitations. Nor did the ALJ (1) explicitly accept or reject the opinion's of Dr. Zavotsky and Dr. Towle, that Correll should never perform certain postural activities, including stooping, crouching, crawling; (2) determine whether Correll's treating physicians' opinions are entitled to controlling weight; or (3) discuss the weight to be given to the respective opinions.

Correll challenges the ALJ's use of the Grid, and his concomitant unexplained disregard of the treating physicians' opinions regarding Correll's postural limitations.

## II.  DISCUSSION

### A.  Standard of Review

After a final determination by the Commissioner denying a

claimant's application for benefits, and upon timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the  ALJ's decision.  See 42 U.S.C. § 405(g).  My review is limited in scope, however, because the ALJ's factual findings are conclusive if supported by "substantial evidence." See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  While the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to the experts," Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam), I must defer when the ALJ has reasonably settled a credibility issue, drawn an inference from the record evidence, and resolved a conflict in the evidence,  see Irlanda Ortiz, 955 F.2d at 769.  In the end, I must "uphold the [ALJ's] findings...if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion,"  id. (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted), even where the record can be construed

to support another conclusion, see Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

## B.  The Social Security Act

### 1.  General Principles

In relevant part, the Social Security Act (the "Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  As indicated above, the Act directs the State ALJ to apply a five-step sequential analysis to determine whether a claimant is disabled.[8]  See 20 C.F.R. § 404.1520.

At step four of the process, the ALJ must determine whether the claimant's impairment prevents her from performing her past work.  See id. § 404.1520(e).  To make this determination, the

---

[8]  In applying the five-step sequential analysis, the ALJ is required to determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents or prevented the claimant from performing past relevant work; and (5) whether the impairment prevents or prevented the claimant from doing any other work.  See 20 C.F.R. § 404.1520 (2000).

ALJ must assess both the claimant's RFC, that is, what the claimant can do despite her impairments, and the demands of the claimant's prior employment.[9] See id.; 20 C.F.R. § 404.1545(a); see also Santiago v. Sec'y of Health and Human Servs., 944 F.2d 1, 7 (1st Cir. 1991) (per curiam). The claimant, however, bears the burden of showing that she does not have the RFC to perform her past relevant work. See Santiago, 944 F.2d at 5.

At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam). The Commissioner must show that the claimant's limitations do not prevent her from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam) ("The standard is not employability, but capacity to do the job.").

"Where a claimant's impairments involve only limitations in

_____

[9] The ALJ uses the claimant's RFC as the basis for deciding what types of work a claimant can perform in spite of her impairments. 20 C.F.R. § 404.1545(a).

meeting the strength requirements of work," the Grid provides "a 'streamlined' method by which the [Commissioner] can carry [her step five] burden." Heggarty, 947 F.2d at 995 (citing Ortiz v. Sec'y of Health and Human Services, 890 F.2d 520, 524 (1st Cir. 1989)(per curiam)). "Where a claimant has non-exertional impairments in addition to exertional limits," however, the Grid may not accurately reflect the availability of jobs the claimant can perform. Id. at 996. If a non-exertional limitation "significantly affects [the] claimant's ability to perform substantially the full range of jobs" at a given strength level, the Commissioner may not rely on the Grid to carry her burden, and the testimony of a vocational expert is usually required. Id. (quoting Lugo v. Secretary of Health and Human Servs., 794 F.2d 14, 17 (1st Cir. 1986)).

## 2. **Determinating a Claimant's RFC**

In determining a claimant's RFC, the ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities. See SSR 96-8p, 1996 WL 374184, at *3 (1996); see also Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984) (holding that the ALJ's findings on a claimant's RFC were insufficient where the ALJ determined the

claimant's RFC in a conclusory manner without a function-by-function assessment).  The ALJ must "consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or disability testified to by the claimant or others."  Ferraris, 728 F.2d at 585; see also 20 C.F.R. § 404.1545(a) (stating that the RFC must be based on all relevant evidence).  The ALJ is not free to simply ignore relevant evidence in the record, especially when that evidence supports a claimant's cause.  See Nguyen, 172 F.3d at 35. Moreover, the ALJ must specify the evidentiary basis for his RFC determination.  SSR 96-8p, 1996 WL 374184, at *7; see also White v. Sec'y of Health & Human Servs., 910 F.2d 64, 65 (2d Cir. 1990) (noting that the failure to specify a basis for the RFC determination is a sufficient reason to vacate a decision of the Commissioner).

### 3.  Correll's Argument

As previously noted, Correll challenges the ALJ's use of the Grid and his concomitant unexplained disregard of her treating physicians opinions that she faced non-exertional limitations on her ability to stoop, crouch, crawl, balance, and manipulate.  In Correll's view, the ALJ was obliged either (1) to credit these

opinions and consult with a vocational expert as to whether, in light of Correll's non-exertional limitations, there is a significant number of jobs in the national economy that she can perform; or (2) to explain why he was not crediting or not fully crediting these opinions.  I agree.

Drs. Zavotsky and Towle opined that Correll should only occasionally climb, balance, or kneel and that she should never stoop, crouch, or crawl.  Dr. Towle characterized Correll's ability to reach, handle, feel, push, and pull as slow and uncomfortable, and Dr. Zavotsky opined that Correll was limited in her ability to reach, feel, push, and pull.  Although the ALJ references these opinions in his decision, he does not explicitly determine the weight they should be given.  Nor does he discuss the extent to which the limitations identified in these opinions might reduce the number of jobs that Correll was capable of performing.

Depending on the weight assigned to these medical opinions, Correll's non-exertional limitations, whether considered individually or in combination, may circumscribe the number of jobs within the sedentary-work category that Correll could perform.  Her non-exertional limitations thus could prevent the

ALJ from being able to use the Grid and instead require that he consult with a vocational expert to determine the extent to which they affect her ability to perform sedentary work.[10] See Heggarty, 947 F.2d at 995. The ALJ's failure to determine the weight given to each of the physical capacity assessments is a fatal deficiency that requires a remand. See Nguyen, 172 F.3d at 35; Nguyen v. Callahan, 997 F. Supp. 179, 182 (D. Mass. 1998); see also SSR 96-9p, 1996 WL 374180, at *2.

## III. CONCLUSION

Because the ALJ failed to make findings concerning the severity of Correll's non-exertional postural and physical limitations and the effect of these limitations on her ability to work, I am unable to determine whether the ALJ should have consulted with a vocational expert to determine the extent of the erosion of Correll's occupational base. Accordingly, on remand

---

[10] SSR 96-9b provides that consultation with a vocational resource concerning the erosion of the occupational base may be appropriate if (1) "an individual is limited to balancing even when standing or walking on level terrain", SSR 96-9p, 1996 WL 374185, at *7., (2) "the individual is limited to less than occasional stooping", id. at *8, or there exists "any significant manipulative limitation of an individual's ability to handle and work with small objects." id.

the Commissioner shall explicitly determine the weight to be given to Correll's treating physicians' capacity assessments. If any of the limitations identified in these assessments is deemed to be significant, the Commissioner shall, consistent with SSR 96-9p, consult with a vocational expert to determine the erosion of Correll's sedentary occupational base. Accordingly, I vacate the ALJ's decision, pursuant to sentence four of 42 U.S.C. § 405(g), and remand this case for further proceedings in accordance with this Memorandum and Order.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 25, 2002

cc: D. Lance Tillinghast, Esq.
    David L. Broderick, Esq.