Payeur v. SSA                    CV-01-034-JD  08/14/01

UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Thomas Payeur

     v.                              Civil No. 01-034-JD
                                     Opinion No. 2001 DNH 151
Larry G. Massanari


                           O R D E R


     The plaintiff, Thomas Payeur, brings this action pursuant to

42 U.S.C.A. § 405(g) seeking judicial review of the decision by

the Acting Commissioner of the Social Security Administration

denying his application for Title II social security benefits.

Payeur, who claimed a disability due to problems with his neck

and back, contends that the Administrative Law Judge ("ALJ"),

Robert S. Klingebiel, failed to properly assess his residual

functional capacity and failed to develop the record with respect

to his mental impairments.  The Acting Commissioner moves to

affirm the decision.  For the reasons hereinafter given, the

Commissioner's decision is reversed, and the case is remanded for

further administrative proceedings.



                       Standard of Review

     The court must uphold a final decision of the Commissioner

denying benefits unless the decision is based on legal or factual

error.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76

F.3d 15, 16 (1st Cir. 1996) (citing <u>Sullivan v. Hudson</u>, 490 U.S. 877, 885 (1989)).  The court's "review is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999).  The Commissioner's factual findings are conclusive if based on substantial evidence in the record.  <u>See</u> 42 U.S.C.A. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (internal quotation omitted).

<u>Background</u>

Thomas Payeur applied for social security benefits based on a workplace injury to his back that occurred on June 24, 1991, when he was thirty-one years old.  At the time of the accident, Payeur was working as a concrete foundation worker.  His other previous work included being a car wash attendant, assembler, machine operator, and a tannery worker.

Payeur began treatment for his back injury on June 27, 1991, when the doctor found bilateral lumbar spasm and diagnosed cervical and low back strain.  He continued to experience pain and was examined by his family practitioner, Dr. Bennett, on July 8, 1991.  Dr. Bennett diagnosed spinal injury secondary to a

2

fall.  He prescribed anti-inflammatory and analgesic medication.
Payeur's medical records indicate that he continued to treat with
Dr. Bennett into 1996 without resolving his back problems.  The
later notes indicate problems with depression and anxiety.  On
March 4, 1996, Dr. Bennett wrote a note as follows, "To whom it
may concern:  Mr. Payeur had a back injury which disabled him
from any heavy work.  He should be able to do light work, that
does not require lifting."

Payeur was also treated by several orthopedists.  Dr.
Geppert examined Payeur in August, September, and December of
1991.  In August, Dr. Geppert concluded that Payeur had a bruised
back and cervical strain without neurological deficits.  He
recommended work hardening and physical therapy.  He indicated in
September of 1991 that Payeur would be able to resume light duty
work without excessive bending, lifting, or other heavy
construction activities.  In September, he assessed lumbar strain
with disproportionate pain and recommended physical therapy.  At
the December visit, Dr. Geppert found that Payeur complained of
pain that seemed out of proportion to the injury and told him he
could return to work after he completed the work hardening
program.

Between June of 1992 and May of 1995, Payeur treated with a
chiropractor, Dr. Clark, who initially expected Payeur to be

released without restrictions within three weeks. He later noted less progress. On May 16, 1995, Dr. Clark completed a physical capacity evaluation in which he indicated that Payeur could sit, stand, or walk for one hour at a time in an eight hour day with total sitting limited to three hours and standing limited to four hours and walking limited to one hour. He also found that Payeur should not even lift five pounds, that his use of his hands for repetitive activities was limited, that he could bend occasionally but should not crawl or climb, and that he should limit his driving because of the need to turn his head.

Dr. John Welch examined Payeur on May 25, 1992. Dr. Welch noted Payeur's complaints of chronic pain in his lower back with headaches and neck pain. On examination, however, Dr. Welch found no evidence of deficits or radiculopathy, neuropathy, or myelopathy. He noted that Payeur seemed anxious and angry, but he found nothing but chronic pain syndrome. He suggested psychological counseling.

Payeur saw Dr. George Costello, an orthopedic surgeon, on December 14, 1992. Dr. Costello found that Payeur's x-rays were essentially normal confirming Dr. Welch's evaluation and results in May of 1992. Dr. Costello's impression, based on Payeur's complaints of pain and his less-than-optimal effort in flexion testing, was that Payeur had cervical and lumbar strain with

4

chronic pain syndrome due to spasms.  An MRI was done on March 25, 1993.  Dr. Costello found that the lumbrosacral spine was within normal limits, but the cervical spine showed a significant disc protrusion at C6-C7 and a question of protrusion at C5-C6.

In April of 1993, orthopedic surgeon Dr. Donald Cusson examined Payeur.  He did not have the March 1993 MRI, that Dr. Costello interpreted to show a disc protrusion.  Dr. Cusson noted that Payeur appeared to be depressed but found no abnormalities in his examination.  Dr. Cusson found no reason for current medical treatment and concluded that Payeur should have returned to his usual work a long time ago.

Payeur was examined by Dr. Clinton Miller, a neurosurgeon, on June 11, 1993.  After examination and review of the x-rays and MRI, Dr. Miller concluded that Payeur had had a significant traumatic cervical spine injury which is now associated with chronic neck pain and suggestive of LC-7 radiculopathy.  He also found evidence on the MRI of significant cervical disc disease at C6-C7.

Payeur saw Dr. Miller again in September when a CT scan showed no evidence of soft or hard disc herniation or any other abnormality.  He concluded that it was unlikely that herniation or any other abnormality caused Payeur's pain symptoms, although it was possible that changes within the discs might account for

5

some of his pain.  Dr. Miller saw Payeur again in October of 1993 when Dr. Miller noted that the examination was difficult.  After reviewing a new MRI done in June of 1994, Dr. Miller concluded that the MRI suggested post-traumatic disc protrusion but that Payeur's symptoms were out of proportion with the abnormality. Based on Payeur's attitude, Dr. Miller would not recommend surgery.

Dr. Stephen Seeman of Psychotherapy Associates, Inc. conducted an initial consultation with Payeur on June 21, 1994, and saw him again in July.  Dr. Seeman found Payeur's rambling account of his history difficult to follow and contacted Dr. Bennett for further information.  Dr. Bennett reported that because of Payeur's alcohol use, his behavior was not unusual. At the last July session, Payeur complained of pain in his neck and vented his frustration with the system.  Payeur refused to sign a release for treatment and did not schedule further appointments.

In March of 1997, Dr. A. W. Campbell reviewed Payeur's record and found that he could occasionally lift up to twenty pounds, frequently lift up to ten pounds, and stand and/or walk and sit for up to six hours in an eight hour day.  He noted that Payeur had limited capacity to do overhead reaching and frequent bending and turning of the head and neck.  Dr. Campbell's opinion

6

was affirmed by Dr. Burton Nault.

A hearing was held before ALJ Klingebiel on January 6, 1998. Payeur, who was represented by counsel, appeared and testified. He said that his daily pain symptoms were at a level of seven or eight, although some days were better than others. He said that his daily activities include feeding and caring for his three cats, doing dishes, stretching and doing his therapy, and picking up the house.

The ALJ issued his decision on April 7, 1998. He found that Payeur had severe degenerative disc disease of the cervical spine and lumbar strain that did not meet or equal a listed impairment. He found that Payeur retained the residual functional capacity for a full range of light work, but could not return to his previous work. Based on the Medical-Vocational Guidelines ("the Grid"), 20 C.F.R. Part 404, Subpart P, Appendix 2, Rules 202.17 and 202.18, the ALJ concluded that Payeur was not disabled. The Appeals Council denied his request for review.

## Discussion

Payeur seeks reversal of the ALJ's decision on the grounds that the decision is not based on substantial evidence. More particularly, Payeur argues that the ALJ improperly found that he was capable of a full range of light work, without distinguishing

the contrary opinions of the consultative doctors and his treating doctor, and failed to develop the record with respect to evidence of his mental impairment. The Commissioner argues that the RFC for light work is well substantiated in the record and that the ALJ properly considered the other evidence.

Payeur's application was denied at step five of the sequential evaluation process set forth in 20 C.F.R. § 404.1520.[1] At the fifth step, the Commissioner has the burden to show that despite the claimant's severe impairment, he retained the residual functional capacity ("RFC") to do work other than his prior work during the covered period and that work the claimant can do exists in significant numbers in the relevant economies. See Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991). "Where a claimant's impairments involve only limitations in

---

[1] The ALJ is required to make the following five inquiries when determining if a claimant is disabled:

(1) whether the claimant is engaged in substantial gainful activity;
(2) whether the claimant has a severe impairment;
(3) whether the impairment meets or equals a listed impairment;
(4) whether the impairment prevents the claimant from performing past relevant work; and
(5) whether the impairment prevents the claimant from doing any other work.

See 20 C.F.R. § 404.1520.

meeting the strength requirements of work, the Grid provides a 'streamlined' method by which the [Commissioner] can carry this burden." Id. (citing Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1982)).

In this case, the ALJ found that Payeur was capable of doing a full range of light work, without any restrictions or limitations, and relied on the Grid to determine that he was not disabled. At the hearing level, the ALJ is responsible for assessing the claimant's RFC based upon all of the relevant evidence of record, including the medical records and assessments by state agency consultants. See 20 C.F.R. §§ 404.1546 & 404.1545(a); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996); Canfield v. Apfel, 2001 DNH 078, Civ. No. 00-267-B, at *13-19 (D.N.H. Apr. 19, 2001). The ALJ is to provide a narrative discussion of the RFC assessment in which he describes how the record evidence supports each conclusion. See SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996); Canfield, supra, at *13-14.

The ALJ here provided a summary review of Payeur's injury and treatment for back problems. The ALJ concluded that Payeur's degenerative disc disease of the cervical spine and lumbar spine limited his ability to perform basic work functions so that he could not do work that required lifting and carrying more than twenty pounds occasionally or more than ten pounds frequently.

The ALJ did not discuss the evidentiary basis for his determination of Payeur's ability to lift and carry weight as part of his RFC. The ALJ then reviewed Payeur's subjective complaints of pain, found them not to be credible, and concluded that Payeur was capable of doing a full range of light work.

As Payeur points out, the ALJ never addressed the RFC assessments done by Dr. Campbell and affirmed by Dr. Nault and Dr. Bennett. While those assessments concluded that Payeur was capable of light work, Dr. Campbell added restrictions against overhead reaching and frequent bending and turning of the neck and Dr. Bennett limited him to work that did not require lifting. The ALJ's assessment, that Payeur is capable of a full range of light work, is contrary to the assessments of Dr. Campbell and Dr. Bennett and does not explain either the evidentiary basis for his assessment or the reason he discounted the limitations found by the others. Therefore, the ALJ's RFC assessment, without any restrictions, is not supported by substantial evidence in the record nor is the assessment properly presented in the decision as required by the cited social security rulings.

The ALJ's error does not necessarily undermine his decision and require remand if the restrictions noted by Dr. Campbell and Dr. Bennett would not significantly affect Payeur's ability to perform the full range of jobs available at the light exertional

10

level.  See Heggarty, 947 F.2d at 996.  Reaching and bending are non-exertional activities while lifting and carrying are exertional.  See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  The work categories of sedentary, light, medium, heavy, and very heavy exertional levels are based on the exertional requirements for that work.  See 20 C.F.R. § 404.1567.

Dr. Bennett's assessment that Payeur was capable of light work that does not require lifting, could be interpreted to mean that Payeur could not lift more than the weight limits for light work or, in contrast, that Payeur could lift no weight at all. If Dr. Bennett intended his restriction literally, that Payeur could not lift at all, he would not be able to perform work at the light exertional level.  See § 404.1567(b).  The note does not indicate whether Dr. Bennett was aware of the regulatory provisions for the exertional levels of work or what he may have intended by the lifting restriction.  Given the ambiguity of the note and the lack of clear guidance in the record from other physicians as to Payeur's capabilities, Bennett's assessment cannot be given substantial weight based on the present record.[2]

_____

[2]For example, Dr. Cusson, an orthopedic surgeon, found that Payeur was not limited in any way and was capable of returning to his previous heavy work while Dr. Clark, a chiropractor, found that Payeur was significantly restricted in both exertional and

11

See 20 C.F.R. 404.1527(d).

Dr. Campbell's restrictions on reaching, bending, and turning are non-exertional. When a claimant is restricted in performing a non-exertional activity, but is still capable of performing that activity at least occasionally, the restriction would have little effect on the claimant's ability to perform the full range of work at the light level. See Frustaglia, 829 F.2d at 195. On the other hand, significant restrictions on non-exertional activities might affect a large number of jobs that would otherwise be available at the light exertional level. See SSR 85-15, 1985 WL 56857, at *7 (1985).

Dr. Campbell found that Payeur was limited in his ability to do overhead reaching, and that he could not do frequent bending or turning of his head and neck. Based on Dr. Campbell's assessment, Payeur was limited in his ability to do the cited activities although he was not precluded from them. A vocational expert attended the hearing, but the record does not include any opinion from her either in the transcript of the hearing or as a written report.

If Payeur were only restricted from frequent bending, his

---

non-exertional activities. In addition, the record is replete with physicians' notes that Payeur exaggerated his symptoms or that his symptoms were greater than his physical condition would suggest.

12

ability to do a full range of light work would be unaffected. See Frustaglia, 829 F.2d at 195. Each restriction found by Dr. Campbell, taken individually, is not a significant restriction on that activity. However, if the restrictions as found limited Payeur's ability to perform the full range of light work, the ALJ could not rely on the Grid conclusively for his decision. See Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993). There is no evidence in the record or elsewhere, as to what effect the combination of the three restrictions would have on Payeur's ability to perform a full range of light work.

While Dr. Campbell's assessment provides substantial evidence to support an exertional level of light work, the ALJ has not shown that the non-exertional restrictions would still permit Payeur to perform a full range of light work. As a result, the ALJ could not rely on the Grid to satisfy his burden of showing that jobs exist that Payeur could perform. The ALJ's finding of not disabled is not supported by substantial evidence.

The case must be remanded for reassessment of Payeur's RFC giving full consideration to the evidence of record, including any necessary additional evidence. The court will not address Payeur's second ground for challenging the ALJ's determination, claiming that the ALJ erred in failing to develop the record with respect to mental impairments. However, on remand it would

13

behoove the ALJ to review this matter carefully and, if necessary, further develop the record.

Conclusion

For the foregoing reasons, the claimant's motion to reverse (document no. 4) is granted to the extent that the Commissioner's decision is reversed and the case is remanded for further administrative proceedings. The Commissioner's motion to affirm (document no. 5) is denied.

Since this is a "sentence four" remand, the clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

August 14, 2001

cc: D. Lance Tillinghast, Esquire
David L. Broderick, Esquire