**Kinney v. SSA**                    **CV-01-270-B    06/20/02**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Gloria Kinney**

    **v.**                                     Civil No. 01-270-B
                                          Opinion No. 2002 DNH 124
**Jo Anne Barnhart, Commissioner,**
**Social Security Administration**


**MEMORANDUM AND ORDER**

On March 16, 1998, Gloria Kinney filed an application with the Social Security Administration ("SSA") for Title II disability insurance benefits ("DIB"). Kinney alleged a disability onset date of November 1, 1987. Based on her earnings record, Kinney had to demonstrate that she was disabled on or before June 30, 1996. SSA denied her application initially and again on reconsideration. Kinney filed a timely request for rehearing on which administrative law judge ("ALJ") Robert Klingebiel held a hearing. On September 24, 1999, the ALJ issued his decision denying Kinney's application because, prior to her date last insured, she retained the ability to perform her past relevant work. Kinney appealed, but on May 17, 2000, the Appeals

Council denied her request for review. Accordingly, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").

Kinney brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the denial of her application for DIB. For the reasons set forth below, I deny Kinney's motion for an order reversing the decision of the Commissioner, and grant the defendant's motion for order affirming the decision of the Commissioner.

## I. BACKGROUND[1]

### A. Work History

Kinney was born May 22, 1944, and last met the disability insured requirements of the Social Security Act (the "Act") in June 1996 when she was 52 years old. Kinney graduated high school, and has worked as a bookkeeper for a restaurant, and as an office manager for an insurance company and a real estate company. Most recently, Kinney worked as an office manager in a

---

[1] Background facts are largely taken from the Joint Statement of Material Facts (doc. no. 11) submitted by the parties.

dental office from June 1993 to June 1996. Kinney alleges that fibromyalgia, fatigue, migraine headaches, anxiety and depression have prevented her from performing basic work activities since November 1, 1987. Kinney's earnings record shows that she last met the insured status requirements of the Act on June 30, 1996. Since her alleged date of onset, Kinney consistently performed some work on a part-time basis. However, her earnings over the entire period have not, on average, been high enough to render her employment "substantial gainful activity." Therefore, Kinney has not been "employed" within the meaning of the Act since June 1996.

B.   **Medical Evidence Prior to Kinney's Date Last Insured**

On April 23, 1991, Kinney sought treatment from Dr. Millstein for bilateral shoulder pain that she had been experiencing for two months. Upon examination, Dr. Millstein observed that Kinney's pain was intermittent and fairly well localized, and was not accompanied by numbness or weakness. He further observed that Kinney experienced some diffuse stiffness in her hand in the mornings, had a full range of motion in her shoulder without crepitus (grating of a joint), mild tenderness in the biceps tendon anteriorly, a mild decrease in her range of

-3-

motion on external rotation, and no neck tenderness over the spinous process. Dr. Millstein diagnosed Kinney with left shoulder pain consistent with tendinitis, and prescribed a trial of the anti-inflammatory Voltaren, along with moist heat.

From July 12, 1991 to October 17, 1996, Dr. Robert Swiggett treated Kinney for symptoms including pain in her left shoulder, stiffness in her right hip, limited motion in her right shoulder, and mid-low back pain without radiation. During Kinney's initial visit, Dr. Swiggett observed that Kinney had forward flexion to ninety degrees, abduction to eighty degrees, and internal and external rotation that was severely limited. Dr. Swiggett diagnosed her with severe adhesive capsulitis, referred her for physical therapy, and continued her Naprosyn prescription. During the course of Kinney's treatment, Dr. Swiggett continued to prescribe physical therapy. He also prescribed a Medrol dose pack for inflammation, and Clinoril, Relafen, and Flexeril for pain. Kinney underwent manipulation under anesthesia. During Kinney's last continuous visit, on September 8, 1992, Dr. Swiggett noted that her pain was gradually decreasing and her range of motion increasing. He discharged her to a home therapy program and scheduled a followup visit in two months. Kinney did

-4-

not return to Dr. Swiggett for over four years.

Kinney saw Dr. Larry Pressman on May 14, 1993. He observed slight limitations in Kinney's shoulder motion bilaterally, that Kinney was in no acute distress, had full range of motion in her hip and knee, and had no focal muscle weakness in her arms or legs. During this visit, Kinney did not complain of disabling pain and Dr. Pressman's impression did not include any rheumatological limitations.

Dr. Ernest D'Angelo treated Kinney for headaches from January 9, 1991 until January 25, 1995. He prescribed Fiorinal and Fioricet for Kinney's headache pain and Augmentin and Dimetapp to relieve the symptoms associated with her sinusitis. On February 22, 1995, Dr. D'Angelo noted that Kinney's diagnosis was chronic and recurrent headaches.

On October 4, 1993, Dr. Mark Reiner saw Kinney for her headaches. Dr. Reiner noted that Augmentin helped Kinney's headaches, which she had been having three or four times a month.

On November 30, 1993, Kinney underwent a CT scan of her sinuses, which came back normal.

On February 7, 1995, Kinney saw Dr. Richard Levy for her headaches. Dr. Levy noted that Kinney had a five year history of

intermittent headaches that were typically bifrontal and suboccipital and extended into the cervical musculature, and that she found some relief with Fiorinal. However, Kinney had experienced a headache for an entire month, during which she experienced several days of subjective vertigo. Dr. Levy noted that Kinney's neurological examination was normal. He diagnosed her with mixed tension type headache and migraine without aura. He prescribed a trial of Phrenilin Forte to relieve the symptoms of her tension headaches and to replace the Fiorinal, which Kinney didn't like because it contained caffeine.

On February 24, 1995, Kinney returned to Dr. Levy with an acute headache. The frequency of her headaches had increased, but she had an excellent response rate (75%) to the Phrenilin Forte. Dr. Levy's impression was that Kinney was experiencing a common migraine with associated muscle tension. Dr. Levy noted Kinney's difficult patient behavior, including refusal of prescriptions and therapies. Out of desperation, Dr. Levy prescribed Kinney Valium. He hoped that the Valium would help her to sleep and that, as a result, Kinney's headaches would subside. Kinney acceded to a brain CT Scan. On March 2, 1995, Kinney underwent a CT scan of her brain, the results of which

were normal.

From October 1995 through November 1995, Dr. John Bloomer treated Kinney for shingles. During this time, Kinney also complained of headaches and pain in her right upper quadrant, radiating to her back but not her shoulder.

**C.   Medical Evidence After Kinney's Date Last Insured**

During a visit to Dr. Swiggett on October 17, 1996, Kinney complained of paracervical discomfort that had been occurring for several years. Dr. Swiggett observed that Kinney had diffuse tenderness to both trapezii; however, she had a full range of motion in her cervical spine and both shoulders, and she had no motor or sensory deficits in her upper extremities. Dr. Swiggett diagnosed Kinney with chronic myofacial pain.

On October 29, 1996, Kinney had a comprehensive physiatrics consultation with Dr. Gale Brown. During this examination, Dr. Brown noted that Kinney left her work at the dentist office in June of 1996, when she required treatment for pneumonia. Dr. Brown observed that Kinney's cervical pain was predominantly with rotation and that, with palpitation, there were multiple trigger points involving the cervical extensors, trapezii, levator scapulae and rhomboids. Dr. Brown diagnosed Kinney with chronic

cervical myofascial pain, significant axial deconditioning, a sleep disorder, and possible mood disorder. Dr. Brown prescribed Nortriptyline for treatment of depression and eight physical therapy sessions.

During an examination with Dr. Brown on November 15, 1996, Kinney complained of exacerbating neck pain and headaches. Dr. Brown observed that Kinney's cervical range of motion was limited in rotation bilaterally to approximately seventy degrees on the right side and sixty-five degrees on the left side, and that she had increased posterior cervical pain with cervical rotation to the left. Kinney's cervical extension was limited to forty degrees, her flexion was nearly full, and the range of motion in her shoulder was intact. Dr. Brown continued Kinney's physical therapy regimen and prescribed Valium and Trilisate[2] to treat pain in her shoulder.

Kinney's last visit with Dr. Brown was on December 6, 1996. On that date, Dr. Brown observed tenderness over the cervical facet area bilaterally, mildly limited cervical range of motion on rotation and that her neurological examination was intact.

---

[2]Earlier that month, Kinney refused a prescription for Trilisate from Dr. Brown.

Kinney had not tried the Nortriptyline that Dr. Brown prescribed in October. Dr. Brown continued to prescribe Trilisate and continued with physical therapy, massage, and home exercise. Dr. Brown scheduled a follow-up visit for six weeks later, but Kinney did not return.

On October 31, 1996, Kinney had an X-ray of her cervical spine, which revealed that Kinney had degenerative changes, especially at C3-4 and C4-5, with posterior spurring and neural foraminal encroachment that was greater on the right side.

On September 30, 1997, Dr. Shearman diagnosed Kinney with fibromyalgia and bilateral frozen shoulders.

Dr. Humberto Valdes provided Kinney mental health treatment from October 21, 1997 until March 5, 1998. Kinney revealed that she was having problems with her marriage, that she slept for only about five hours a night, and that she had low energy and had experienced mood swings for five to six years. Kinney was diagnosed with an "Adjustment Disorder, Mixed and Significant Moodiness," and it was recommended that she obtain psychotherapy.

On June 12, 1998, Craig E. Stenslie, Ph.D., a Disability Determination Services' non-examining consultant, completed a Psychiatric Review Technique form on Kinney. Stenslie evaluated

Kinney's condition up until her date last insured, and concluded there was insufficient medical evidence to establish that she suffered from a mental impairment.

On September 3, 1998, Dr. John Bloomer completed a Fibromyalgia Residual Functional Capacity Questionnaire. He concluded that Kinney met the American Rheumatological Society criteria for fibromyalgia, was suffering from chronic fatigue syndrome, and opined that her condition was expected to last for at least twelve months. Dr. Bloomer noted that Kinney had pain bilaterally in her lower back, cervical spine, chest, shoulders, arms, hands/fingers, hips, legs and knees/ankles/feet. Dr. Bloomer also noted that Kinney's symptoms frequently/constantly interfered with her ability to concentrate, and that she was severely limited in her ability to deal with work stress. Kinney was not currently taking any prescription medicines, though she would take Relafen and Fiormor when needed. Kinney was able to stand/walk for two hours out of an eight-hour day and sit for at least six hours out of an eight-hour day. Dr. Bloomer opined that Kinney needed a job that would allow her to shift positions and take a break every half hour. Dr. Bloomer additionally noted that Kinney needed to elevate her legs while sitting. Finally,

Dr. Bloomer found that Kinney was limited in her ability to do repetitive reaching, handling, or fingering, and that she had the ability to lift ten pounds only occasionally.

On February 2, 1999, Dr. Robert Rainie, a Disability Determination Services' non-examining consultant, completed a physical residual capacity assessment on Kinney. Dr. Rainie found that Kinney could frequently lift ten pounds, occasionally lift twenty pounds and had an unlimited ability to push and/or pull. Dr. Rainie opined that Kinney could sit, stand, and walk for six hours out of an eight-hour day. Dr. Rainie thought that Kinney could only occasionally climb, balance, stoop, kneel, crouch and crawl and that she was limited in her ability to reach in all directions.

D.  **Kinney's Testimony**

At the hearing before the ALJ, Kinney testified that she has pain in her neck and shoulders, that she has migraines, frequently eight times a month, and that she had migraines as frequently as eight times a month back in 1996. When Kinney has a migraine it can last two days, during which time she sleeps in a dark room and takes medication. She also has pain in her right arm, like tennis elbow, and it affects her from her fingertips to

-11-

her scapulary.  She has had this pain since prior to her date last insured.  Kinney rates her pain as a seven on a ten-point scale on an average day; however, exertion such as opening a window can flare her pain to a ten.  When her pain flares up, Kinney applies a cold pack, takes medication and tries to relax.

Kinney testified that, on an average day, she awakens between eight and nine in the morning, but that it takes her an hour to get out of bed because her hands hurt and her bones feel as if they are swelling.  During the day, Kinney prepares meals, waters the plants, feeds her cats and watches television.  Kinney naps for an hour or two in the afternoon, and sleeps for two hours on a good night.

Kinney can dust furniture, unload a dishwasher, wash and dry clothes and go food shopping, but she is unable to lift a basket of laundry or to perform any lifting while shopping.  Kinney is able to go out to dinner with friends, though she has to cancel plans about one-third of the time.  She goes to the movies three times per year, but has difficulty sitting through a two hour movie.  Driving within ten miles of her home is possible, but she needs to take at least one break during a two and a half hour car trip.  When paying bills, Kinney has pain in her hand after

writing six checks.  Kinney was able to both sit in an elevated position and stand for thirty minutes, but she cannot sit or stand for one hour out of an eight-hour day.  She can lift a gallon of water with both hands, but could not lift this weight over her head.

Kinney also testified about concentration and memory problems.  She has difficulty concentrating on television programs, and finds that her attention wanders after one to two minutes.  Kinney also has problems remembering where she parked her car.  Kinney is only able to read for fifteen to twenty minutes before she has to put her book down.

**E.    The ALJ's Decision**

In his September 24, 1999 decision, the ALJ applied the five-step sequential evaluation process under which disability applications are reviewed.  See 20 C.F.R. § 404.1520.  In the first step, the ALJ found that Kinney had performed work on a part-time basis since her alleged date of onset of disability; however, her earnings were not high enough to qualify as "substantial gainful activity."  Therefore, the ALJ found that Kinney had not performed substantial gainful activity since November 1, 1987.  At the second step, the ALJ found that

-13-

Kinney's migraine headaches and fibromyalgia constituted severe impairments.  At the third step, he found that Kinney's impairments, although severe, did not meet or equal the criteria of any listed impairment described in 20 C.F.R. § 404, Subpart P, Appendix 1.

In assessing Kinney's residual functional capacity ("RFC"), the ALJ found that, prior to her date last insured, Kinney could not lift and carry more than twenty pounds occasionally or more than ten pounds frequently; could not stand, walk, or sit for more than six hours in an eight-hour day; and that all postural activities were limited to being performed only occasionally. Based on this RFC, the ALJ found at step four of the disability evaluation process that Kinney could return to her former employment, as it did not require the performance of work-related activities precluded by her limitations.  Because the plaintiff was able to return to her past relevant work, she was not under a disability (as defined by the Act) prior to her date last insured.

In reaching this conclusion, the ALJ noted that Kinney's treating and examining physicians did not indicate anywhere in the record that she would be totally disabled prior to the date

-14-

last insured.  For example, Dr. Brown diagnosed chronic cervical myofacial pain, axial deconditioning, sleep disorder and a possible mood disorder.  The ALJ pointed out, however, that Kinney's examination revealed a normal gait and only some pain and limitation of motion in the shoulders, a grossly normal neurological examination, and negative rheumatologic examination.

Although Dr. Bloomer, in a functional capacity questionnaire dated September 3, 1998, noted a functional capacity for less than a full range of sedentary work, the ALJ found that Dr. Bloomer's limited notes do not reveal this level of disfunction prior to Kinney's last date insured.  After a full review of the record, the ALJ did not give Dr. Bloomers's opinion full weight because it was not supported by the facts of the case, was rendered twenty months after Kinney's date last insured, and did not indicate the period for which it was intended.

Finally, the ALJ also found that Kinney's allegations of a disabling pain and other subjective symptoms were not entirely credible.  Since Kinney's alleged onset of disability, she sought medical treatment only sporadically, with no documentation of regular medical treatment from 1992 to 1994.  He found that her initial shoulder problems from 1991 to 1992 responded well to

-15-

treatment.  Relying upon notes from treating physician Dr. Brown, the ALJ concluded that while Kinney did experience some limitations as a result of her impairments, she did not experience pain or other subjective symptoms at a level that would interfere with performing light exertional level work activity.

## II. STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits, and upon timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision.  See 42 U.S.C. § 405(g).  My review is limited in scope, however, because the ALJ's factual findings are conclusive if supported by substantial evidence.  See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicts in the evidence.  See Irlanda

-16-

Ortiz, 955 F.2d at 769.  Therefore, I must "uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion."  Id. (quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted).

The ALJ's findings of fact are unalterable unless they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  I apply this standard in reviewing the issues that Kinney raises on appeal.

### III.  DISCUSSION

In relevant part, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act directs an ALJ to apply a five-step sequential analysis to determine

whether a claimant is disabled.[3]  See 20 C.F.R. § 404.1520.  The ALJ's determinations at steps one through three of this process are not in dispute, so I proceed directly to step four.

At step four of the process, the ALJ must determine whether the claimant's impairment prevents her from performing her past work.  20 C.F.R. § 404.1520(e).  To make this determination, the ALJ must assess both the claimant's residual functional capacity ("RFC"), that is, what the claimant can do despite her impairments, and the demands of the claimant's prior employment.  See id.; 20 C.F.R. § 404.1545(a); see also Santiago v. Sec'y of Health and Human Servs., 944 F.2d 1, 7 (1st Cir. 1991) (per curiam).  The claimant, however, bears the burden of showing that she does not have the RFC to perform her past relevant work.  See Santiago, 944 F.2d at 5.

At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant

---

[3] The ALJ is required to determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents or prevented the claimant from performing past relevant work; and (5) whether the impairment prevents or prevented the claimant from doing any other work.  See 20 C.F.R. § 404.1520.

-18-

can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam). The Commissioner must show that the claimant's limitations do not prevent her from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276 ("The standard is not employability, but capacity to do the job.").

In this case, the ALJ concluded at step four of the sequential evaluation process that Kinney was able to perform her past relevant work prior to her date last insured. Kinney argues that the ALJ's decision must be reversed and remanded because it is tainted by legal errors. First, Kinney argues that the ALJ violated Social Security Ruling ("SSR") 96-2p by failing to explain the weight given to the opinions of her treating physicians, Dr. Bloomer and Dr. Brown. Second, Kinney argues that the ALJ failed to adhere to the requirements of SSR 96-7p when assessing her credibility. I address these arguments in turn.

A.    **Treating Physicians' Opinions**

Kinney argues that the ALJ failed to follow SSR 96-2p in

-19-

evaluating her treating physicians' opinions. Specifically, Kinney contends that the ALJ failed to give specific reasons for his decision not to give the physicians' opinions controlling or great weight, and failed to adopt all the limitations that the treating physicians ascribed to Kinney.

Controlling weight will be given to the medical opinion of a treating physician where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). When a treating physician's medical opinion is not entitled to controlling weight, the ALJ must still determine the appropriate weight to give to the opinion by evaluating certain factors. See id. The ALJ must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether and to what extent the opinion is supported by medical signs and laboratory findings; (4) whether the opinion is consistent with other evidence in the record; (5) whether the physician's opinion concerns medical issues related to his area of specialty; and (6) any other factors which support or contradict the opinion. 20

-20-

C.F.R. § 404.1527(d).

### 1. **Dr. Brown's Opinion**

Kinney argues that the ALJ ignored Dr. Brown's diagnosis of pain, including the October 1996 statement that "[four] years ago, [Kinney] began having bilateral neck pain which radiated to the top of her shoulders." Kinney also faults the ALJ's failure to rely upon the following statements found in Dr. Brown's records: (1) that Kinney experienced "constant bilateral neck pain [with symptoms] aggravated with lifting and reaching for extended periods of time;" (2) that Kinney saw "her symptoms . . . continue[] to progress;" and (3) that she has used numerous medications "without significant benefit." Kinney also argues that the ALJ fails to credit Dr. Brown's diagnosis of chronic cervical myofacial pain.

The selected portions of Dr. Brown's November 1996 notes, when analyzed along side Dr. Brown's complete record, do not support Kinney's conclusion that she suffered from debilitating pain. For example, the notes state that "her symptoms have continued to progress." But, Dr. Brown attributed this to a low grade sinus infection. Dr. Brown's November 1996 notes also state that Kinney has used numerous medications "without

-21-

significant benefit."  However, Kinney had refused a recommendation for Trilisate and, according to the December 1996 notes, did not try the nortriptyline that Dr. Brown prescribed in October 1996.  The ALJ found that Dr. Brown's transition to an independent exercise program, a limited period of massage and use of Trilisate as needed, with no discussion of additional symptom-relief measures, did not support a claim of debilitating pain.

Regarding Dr. Brown's diagnosis of myofacial pain as well as axial deconditioning, sleep disorder, and possible mood disorder, the ALJ found the diagnosis inconsistent with other medical evidence in the file.[4]

Accordingly, the ALJ did follow the procedure outlined in SSR 96-2p and his finding is supported by substantial evidence in the record.

## 2.  Dr. Bloomer's Opinion

Kinney also argues that the ALJ ignored the opinions of Dr.

---

[4]Dr. Brown's examination records revealed a normal gait and only some pain and limitation of motion in the shoulders.  Dr. Brown noted that Kinney's neurological examination was intact.  A cervical x-ray showed only some degenerative changes C3-5 with posterior spurring and neural fominal encroachment. Rheumatologic examination and testing in September 1997 was noted to be negative.

Bloomer as stated in his Fibromyalgia Residual Functional Capacity Questionnaire. Specifically, Kinney contends that the ALJ failed to provide a well-supported reason for ignoring this uncontradicted medical evidence. Kinney further argues that the ALJ's decision to ignore the evidence because it was not a "current assessment" is inconsistent with the record. I disagree.

The ALJ provided a well-supported reason for not relying on Dr. Bloomer's RFC determination. After a review of Dr. Bloomer's brief notes, the ALJ determined that Dr. Bloomer's opinions were not entitled to "full weight" because the doctor's notes did not reveal an inability to perform a full range of sedentary work prior to Kinney's date last insured. Furthermore, the opinion was "not supported by the facts of the case." The ALJ also noted that Dr. Bloomer's opinion was rendered twenty months after the date last insured and the assessment does not indicate whether the opinion was a current or a retroactive assessment, though the ALJ thought it to be a current assessment.

Additional evidence supports the ALJ's decision. Dr. Bloomer treated Kinney from April 1995 through June 1996, and his notes for this time period reveal Kinney had shifting pain that

-23-

waxed and waned; however, he did not diagnose Kinney with fibromyalgia and did not put restrictions on her functional capacity. Dr. Bloomer completed the Fibromyalgia Residual Functional Capacity Questionnaire more than two years after his last examination of Kinney, and his RFC is contradicted by the opinion of Dr. Rainie, a non-examining physician. This additional evidence further strengthens the conclusion that the ALJ's decision to not give controlling weight to Dr. Bloomer's opinions is supported by substantial evidence.

## B.   Kinney's Credibility

Kinney argues that the ALJ failed to follow SSR 96-7p when assessing her credibility. Specifically, she complains that the ALJ failed to consider the record as a whole and failed to consider the factors outlined in SSR 96-7p in determining that Kinney was not fully credible. Again, I disagree.

SSA regulations require that the ALJ consider a claimant's symptoms, including complaints of pain, when he or she is determining whether a claimant is disabled. See 20 C.F.R. § 404.1529(a). When determining whether a claimant's subjective statements are credible, an ALJ must evaluate the medical signs and laboratory findings, any diagnosis, prognosis or other

-24-

medical opinions, and any statements/reports from the plaintiff or treating or examining physicians or psychologists about the patient's medical history. SSR 96-7p. In addition, because an individual's pain can sometimes result in a greater severity of impairment than can be shown by the objective medical evidence, the adjudicator must consider the following evidence, known as "the Avery factors," when assessing the credibility of an individual's statements: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any pain medication; (5) treatment other than pain medication; (6) any other measures that the claimant has used to relieve pain; and (7) other factors concerning the claimant's limitations and restrictions due to pain or other symptoms. See 20 C.F.R. § 416.929(c)(3); SSR 96-7p; Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 22-23 (1st Cir. 1986). In addition to these factors, the ALJ is entitled to observe the claimant, evaluate her demeanor, and consider how the claimant's testimony fits with the rest of the evidence. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

An ALJ's credibility determination must include specific findings and be based on a substantially accurate view of the record evidence.  See Da Rosa v. Sec'y of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam) (ALJ's finding that a claimant is not credible "must be supported by substantial evidence" and must be based on "specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant].").  Moreover, the ALJ's findings with respect to credibility "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p.  When properly supported by record evidence, the ALJ's credibility determination is entitled to substantial deference from this court.  See Frustaglia, 829 F.2d at 195.

The record reflects that the ALJ considered the entire record and took into account the Avery factors.  He considered the duration and frequency of Kinney's pain when he concluded that Kinney's sporadic record of medical treatment was inconsistent with her claim of disabling pain.  See Irlanda Ortiz, 955 F.2d at 769 (holding that gaps in the medical evidence

-26-

constitute "evidence" and that such gaps conflict with claims of "unrelenting pain"); see also Perez Torres v. Sec'y of Health and Human Servs., 890 F.2d 1251, 1255 (1st Cir. 1989)(per curiam) ("The claimant sought no regular treatment for his two allegedly painful conditions, and he submitted no medical evidence of treatment for his back condition. 20 C.F.R. § 404.1513. On this record the ALJ was entitled to discount the severity of the pain complaints . . . "). The ALJ observed that the frequency of Kinney's doctor visits did not correspond with Kinney's allegation of consistent disabling pain. For example, during Kinney's episode of frozen shoulders, she visited Dr. Swiggett monthly. Kinney returned to Dr. Swiggett four years later with complaints of paracervical discomfort that she said had been present for a number of years. The ALJ could reasonably have believed that Kinney would have returned to Dr. Swiggett regularly rather than waiting four years had her pain been consistent and debilitating. Even if the ALJ accepted Kinney's argument that Dr. Brown diagnosed and treated her for disabling fibromyalgia in 1995, this treatment was three years after her treatment with Dr. Swiggett. Kinney's lack of regular treatment for fibromyalgia with Dr. Swiggett or any other physician after

-27-

her alleged onset date of disability supports the ALJ' decision not to credit fully Kinney's subjective complaints of pain.

The ALJ also considered Kinney's use of pain medication and alternative treatments.  Kinney testified that she "did everything the doctors recommended . . . physical therapy . . . prescription drugs . . . everything they recommended."  Kinney responded positively to surgery in 1991 and 1992, after which her doctors then prescribed the conservative use of exercise therapy and massage.  However, Kinney's concern about side effects caused her to turn down several prescriptions including a brief course of corticosteroids for one day, Imitrex, narcotics, stadol nasal spray, and Trilisate.  Even though Kinney complained of problems with sleeping due to her pain, she never took medication specifically to help her sleep.  The absence of the need to use, or the actual use of, stronger pain medications is inconsistent with the severity of the pain Kinney alleged.  See Albors v. Sec'y of Health and Human Servs., 817 F.2d 146, 147 (1st Cir. 1986) (per curiam) ("[The medical evidence], together with the fact that claimant apparently takes nothing stronger than aspirin, supports the ALJ's rejection of claimant's assertions of disabling pain."); Boisvert v. Callahan, 997 F. Supp. 183, 186

(D. Mass. 1998) ("[The ALJ] found that the plaintiff could not reasonably suffer the degree of pain that she alleged without seeking more active treatment or taking pain medication stronger than Tylenol.").

Finally, the ALJ considered Kinney's daily activities. He noted that she cooks, cleans, shops, goes out to the movies and dinner occasionally, and drives for short periods of time. He also considered her testimony that all of these activities are to some degree limited by her pain associated with fibromyalgia and migraine headaches. The ALJ recognized Kinney's limitations when he concluded that, prior to her date last insured, she would not have been able to perform medium or heavy exertional activity. However, he ultimately concluded that her RFC indicated she would have been able to perform a full range of light work activity. The medical evidence in the record supports the ALJ's determination that Kinney's pain did not limit her functional capacity beyond that already assessed.

The ALJ's decision that Kinney's complaints of pain were not fully credible is supported by substantial evidence. See Frustaglia, 829 F.2d at 195. (finding that more express findings would be preferable, but examination of the record demonstrated

-29-

that substantial evidence supported the ALJ's findings).

## IV. CONCLUSION

I deny Kinney's motion for an order reversing the decision of the Commissioner (doc. no. 9) and grant defendant's motion for order affirming the decision of the Commissioner (doc. no. 10).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

June 20, 2002

cc:  David Bander, Esq.
     David L. Broderick, Esq.