Arsenault v. SSA                    CV-03-108-B    05/04/04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Mary Arsenault</u>

   v.                                Civil No. 03-108-B
                                  **Opinion No. 2004 DNH 080**
<u>Jo Anne B. Barnhart,</u>
<u>Commissioner, Social Security Administration</u>


<u>MEMORANDUM AND ORDER</u>

Mary Arsenault applied for Title II Social Security Disability Insurance Benefits ("DIB") on September 7, 2001, alleging an inability to work due to injuries to her right shoulder and cervical disc syndrome. The Social Security Administration ("SSA") denied her application as did an Administrative Law Judge ("ALJ"). He found that although her impairments were severe, they did not meet the requirements of any listed disability. Further, he found that she had a residual functional capacity enabling her to perform various jobs that were available in the national and local economy.

Arsenault brings this action pursuant to § 405(g) of the Social Security Act seeking review of the denial of her application for benefits. She argues that the ALJ did not

properly analyze whether she met the requirements for Listing 1.08 (soft tissue injury), that he did not properly evaluate her pain, nor did he sufficiently explain why he discredited her testimony regarding her ability to work.  For the reasons set forth below, I conclude that the ALJ did not properly analyze the requirements for Listing 1.08.  Therefore, I remand this case to the Commissioner.

## I.  BACKGROUND[1]

### A.  Factual Background

Arsenault is a 32-year-old woman with an eighth grade education.  She worked as a cashier and manager at a gasoline station and convenience store until August 10, 2000, when she stopped due to injuries to her right shoulder and back.  (Tr. 86).  She restarted work in December, but again had to stop due to pain in February 2001.  (Tr. 25).

Arsenault has been treated numerous times for shoulder, back, and neck injuries since January 2000.  On January 28, 2000, Richard Hacker, M.D., treated Arsenault for pain between her

---

[1] Unless otherwise noted, the background facts are taken from the Joint Statement of Material Facts (Doc. No. 9) submitted by the parties.

shoulder blades. Dr. Hacker noted that the discomfort accompanied movement and straining but was not associated with any paresthesia[2] or weakness. Dr. Hacker also noted that Arsenault's symptoms were not relieved by Flexeril or Anaprox,[3] so he prescribed Celebrex[4] and Tylenol #3. (Tr. 130).

A few weeks later, Arsenault went to the Monadnock Community Hospital complaining of sudden onset of neck pain and spasms. Arsenault was unable to move her neck without pain, but denied paresthesia of her upper extremities. She also denied a previous history of cervical trauma or diving accidents. (Tr. 150). The examining doctor, Christopher Krupp, M.D., noted that Arsenault's neck was tender to palpation, but that she had full range of motion and strength. His impression was that Arsenault suffered

---

[2] Paresthesia is an abnormal sensation such as tingling or burning. Stedman's Medical Dictionary 1316 (27th ed. 2000). Hereinafter, Stedman's.

[3] Flexeril relieves skeletal muscular spasm of local origin. Physician's Desk Reference 1929 (55th ed. 2001). Hereinafter, PDR. Anaprox, also called Naprosyn, is a non-steriodal, anti-inflammatory agent. PDR at 2744.

[4] Celebrex is a non-steroidal anti-inflammatory agent. PDR at 2482.

from cervical strain with spasm.  He prescribed Darvocet[5] and gave her a soft collar for her neck.

On August 18, 2000, Arsenault reported to Dr. Hacker that she had felt lower back and knee pain since starting a new job that required her to stand for prolonged periods.  (Tr. 137). Dr. Hacker noted that she had a history of back pain following a car accident several years earlier, but had never been examined for spinal problems.  He noted that she had normal gait, strength, balance, and coordination.  Arsenault visited Dr. Hacker again on September 5, 2000 and complained of generalized aches, lack of energy, and fatigue.  (Tr. 138).  Dr. Hacker's physical examination was unremarkable.  His assessment was fibromyalgia[6] and he prescribed Elavil.[7]  Arsenault's symptoms of fatigue and pain continued through September 11, 2000.  At Dr. Hacker's suggestion, she underwent a bone scan and pelvic

---

[5] Darvocet is a mild narcotic analgesic.  PDR at 1567.

[6] Fibromyalgia is a syndrome of chronic pain of musculoskeletal origin but uncertain cause.  Diagnostic criteria includes pain on both sides of the body above and below the waist.  There must be point tenderness in a least 11 of 18 specified sites.

[7] Elavil is indicated for relief of the symptoms of depression.  Physician's Desk Reference 626 (53rd ed. 1999).

ultrasound at Monadnock Community Hospital on September 14, 2000. The procedures did not reveal any problems. During a follow-up visit on September 20, 2000, Arsenault reported to Dr. Hacker that she was feeling better, but that her symptoms tended to worsen in cold weather.

At Dr. Hacker's request, Arsenault saw Gerald DeBonis, M.D., for neck and shoulder pain. Arsenault reported that she had suffered shoulder pain after prolonged use of her right arm since her car accident years earlier. Arsenault stated that the shoulder pain did not extend beyond her elbow, nor did it occur while at rest, but she complained of nearly constant neck pain. Dr. DeBonis noted that Arsenault's gait and station were normal and that she demonstrated complete range of motion of her cervical spine without pain. Dr. DeBonis did find localized tenderness in the right shoulder, but her range of motion was nearly complete. (Tr. 212). Films of her cervical spine and right shoulder were normal. Dr. DeBonis concluded that Arsenault appeared to have chronic rotator cuff tendinitis[8] of the

---

[8] Tendinitis is inflammation of a tendon. Stedman's at 1794.

supraspinatus.[9]

Arsenault saw Dr. DeBonis again on March 28, 2001 for right shoulder pain. At that time, Arsenault had pain with passive motion as well as instability with abduction and external rotation. His assessment was anterior right shoulder instability with symptoms of secondary impingement and he recommended diagnostic arthroscopy.[10] On April 24, 2001, Dr. DeBonis performed an arthroscopic debridement[11] and subacromial[12] decompression on Arsenault's shoulder. During the procedure, Dr. DeBonis also carried out a thermal capsulorrhaphy[13] and removed bursal[14] tissue. (Tr. 178-79). He noted that the cartilage was

---

[9] The supraspinitis is a muscle in the shoulder joint. Stedman's at 1157.

[10] Arthroscopy is an endoscopic examination of a joint. Stedman's at 151.

[11] Debridement is an excision of devitalized tissue from an area. Stedman's at 460.

[12] The subacromial area is beneath the lateral end of the shoulder blade. Stedman's at 18, 1714.

[13] Capsulorrhaphy is the suturing of a tear or surgical incision in any capsule; specifically, suture of a joint capsule to prevent recurring dislocation. Stedman's at 282.

[14] Bursal tissue is formed by closed sacs filled with fluid usually found in areas subject to friction, e.g., where a tendon

torn, thin, and in some areas, gone.  At the six-week postoperative follow-up visit, Dr. DeBonis found Arsenault to be doing very well with no pain at all and range of motion of the shoulder nearly fully restored.  (Tr. 220).

Arsenault was next seen by Dr. DeBonis on August 2, 2001 when she reported a new injury to her right shoulder that occurred in June when someone grabbed her right arm and yanked it upward and behind her.  (Id).  Dr. DeBonis's examination showed severe limitation of cervical range of motion.  Pain limited her ability to move her right shoulder.  Dr. DeBonis also suspected that Arsenault had carpal tunnel syndrome as well as a cervical disk problem.

On August 22, 2001, Arsenault saw Dr. Hacker, who observed that she had no effusion, redness, or instability of her shoulder.  Her rotator cuff was stable and her cervical spine was not tender.  Dr. Hacker did find spasms and tenderness throughout her upper back and shoulder and assessed shoulder and back strain.  He gave Arsenault a prescription for Flexeril and

---

passes over a bone.  Stedman's at 259.  The bursa removed from Arsenault's shoulder had become inflamed (Tr. 179) which is a condition known as bursitis.  Stedman's at 262.

Anaprox.

Dr. DeBonis treated Arsenault several times for shoulder pain throughout the remainder of 2001.  During a visit on January 7, 2002, he observed no swelling and noted that Arsenault had full passive range of motion of her shoulder.  Dr. DeBonis's diagnosis was right shoulder pain syndrome.

On March 14, 2002, Arsenault began treatment with W. Bradley White, M.D. for shoulder pain.  Dr. White found tenderness at her glenohumeral[15] joint, but not in the area where most of her pain radiated.  He found Arsenault's range of motion to be quite restricted and diagnosed her with adhesive capsulitis, and recommended surgery to address it.[16]  Dr. White did not believe that there was a significant psychological component to her condition.  (Tr. 231).  Arsenault agreed to surgery and Dr. White performed arthroscopy and debridement of her shoulder on March 25, 2002.  During the procedure, Dr. White discovered

---

[15] The glenohumeral joint is the ball and socket joint between the humerus and the shoulder blade.  Stedman's at 935.

[16] Capsulitis is a condition in which there is limitation of motion in a joint due to inflammatory thickening of the capsule.  It is a common cause of stiffness in the shoulder. Stedman's at 282.

degenerative tearing of the anterior and superior labrum.[17]  (Tr. 233).  At a follow-up visit on April 2, 2002, Arsenault reported performing gentle range of motion exercises occasionally and she reported stiffness in her shoulder and elbow.  (Tr. 234).

Dr. White referred Arsenault to Jon Warner, M.D. at Massachusetts General Hospital.  On April 22, 2002, Arsenault reported to Dr. Warner that since her last surgery, she continued to have severe pain and difficulty sleeping at night.  (Tr. 287). Dr. Warner could passively flex her shoulder to an arc of 140 degrees, with Arsenault expressing pain.  His review of an MRI examination revealed a normal rotator cuff.  Dr. Warner found it difficult to ascribe all of Arsenault's complaints of pain to the tearing discovered by White and had the impression that Arsenault had biceps tendinitis.  (Tr. 288).  Dr. Warner suggested another debridement of her shoulder with a biceps tendon tenotomy.[18]

Dr. Hacker treated Arsenault again on May 28, 2002 for shoulder pain.  Arsenault reported that she had re-injured her

---

[17] The labrum is a cartilage "lip" around the margin of the concave portion of some joints.  Stedman's at 957.

[18] Tenotomy is a surgical division of a tendon for relief of a deformity.  Stedman's at 1795.

shoulder during an altercation with her 11-year-old daughter. (Tr. 284). Dr. Hacker's assessment was chronic shoulder pain and he prescribed Oxy-Contin.[19]

On July 10, 2002, Dr. Warner performed a third shoulder surgery on Arsenault. During the procedure, Dr. Warner removed loose cartilage and the residual bursa. (Tr. 266-67). Soon thereafter, on July 14, 2002, Arsenault went to the emergency room of Monadnock Regional Hospital complaining of severe, burning right shoulder pain at the site of the surgery. She was administered Demerol[20] and discharged in the care of her husband. Arsenault returned to Monadnock Community Hospital emergency room for the same symptoms on August 17, 2002.

In addition to shoulder pain, the record also shows that Dr. Hacker treated Arsenault several times for anxiety, depression, panic attacks, and smoking cessation. During each of these visits, which took place between April 2000 and June 2002, Arsenault ascribed her emotional distress primarily to family

---

[19] Oxy-Contin is an opioid analgesic. PDR at 2697.

[20] Demerol is indicated for the treatment of moderate to severe pain. PDR at 2851.

matters.  At various times, Dr. Hacker prescribed Ativan,[21] Atenolol,[22] Zoloft,[23] and Paxil to treat Arsenault's emotional distress.

## B.  Procedural History

On September 7, 2001, after her second surgery but before her third, Arsenault filed an application with the SSA for Title II DIB.  Arsenault claimed that she had been unable to work since August 10, 2000, due to injuries to her right shoulder.  Her file was referred to Joseph Cataldo, M.D., for Disability Determination Services on September 12, 2001.  Dr. Cataldo opined that Arsenault had a reduced functional capacity that limited her to occasionally lifting 20 pounds and frequently lifting 10 pounds.  (Tr. 245).  He also felt that Arsenault could sit and stand for six hours out of an eight-hour work day, and could occasionally bend, lift, climb, and crouch.  (Id).  He noted that she should avoid frequent use of her right arm.  (Id).  Dr.

_____

[21] Ativan, also called Lorzepam, is an anti-anxiety agent. PDR at 3348.

[22] Atenolol is indicated for the treatment of hypertension. PDR at 647.

[23] Zoloft is an antidepressant.  PDR at 2553.

Cataldo concluded that Arsenault's allegations of symptoms were credible, but that they were not credible for her claimed inability to function. (Id).

The SSA denied Arsenault's application for benefits and she filed a timely request for a hearing. ALJ Frederick Harap held the hearing on October 9, 2002.[24] When asked about the cause of her shoulder and back pain, Arsenault stated that it may have been originally triggered by a car accident in June 1999. (Tr. 27). Arsenault stated that her three shoulder operations did not reduce the pain in her shoulder. (Id). She described her pain as a "throbbing, aching, hurting pain" for which she takes extra strength Vicodin which makes her drowsy. (Tr. 28). When asked about her daily routine, Arsenault stated that she was up most of the night because of pain and started her day by 6:00 a.m. In the morning she made sure her two children, aged 11 and 15, got to school. (Tr. 29). She stated that she could do nothing for the rest of the day except watch television for short spans of time and pace to relieve pain. (Tr. 30). She said that her

_____

[24] Because Arsenault's claim was determined using a pilot procedure, she was able to request a hearing before an ALJ without seeking reconsideration.

attention span was limited by pain. (Tr. 32). She asserted that most days she was unable to lift a can of soda with her right arm. She could go grocery shopping when accompanied. (Tr. 30). Her children and husband did the dishes, cleaning, and laundry. (Tr. 30-31). She could not visit family and friends. (Id). When asked what treatment she expected to receive for her shoulder in the future, she testified that she would have cartilage replacement potentially followed by a shoulder replacement, with arthroscopy every two years to "have it cleaned out." (Tr. 26-28).

At the end of the hearing, Arsenault's representative stated that she fit into Listing 1.08, because her disability involved an upper extremity, she was under continuing surgical management which was directed toward salvation and restoration of the major function of her arm, and the restoration was not expected to be complete within twelve months. (Tr. 47).

The ALJ issued an opinion dated December 3, 2002 denying Arsenault's application. He found that she met the nondisability requirements for a period of disability and was insured through the date of his decision. Further, he found that she has not engaged in substantial gainful activity since her alleged onset

date, finding her work after that date to be an unsuccessful work attempt since she quit due to her medical impairment.

Recognizing that she did have severe disabilities, the ALJ nevertheless found that none of them met any of the listed impairments in the regulations. (Tr. at 15). He found that she had a residual functional capacity enabling her to perform light work, based on her activities and lifestyle, and that her statements concerning her own impairment were not entirely credible. He stated that she had "failed to present objective evidence of disabling exertional or nonexertional impairments which have lasted or will last, for the 12 month duration requirement of the Act." (Tr. 16). He did not address, however, whether further surgery and follow-up care would alter that determination.

The ALJ determined that Arsenault "retain[ed] the following residual capacity: light work, which required the ability to lift and/or carry tem pounds frequently and twenty pounds occasionally. [She] cannot work at unprotected heights, around moving machinery or vibrating equipment, and can only occasionally climb balance, stoop, kneel, crouch or crawl. She can only lift with the left hand, and had no independent function

-14-

of the right upper extremity for fine or gross manipulation or lifting." (Tr. 17). Based on testimony of an impartial vocational expert, the ALJ determined that she could perform jobs available in both the local and national economy, such as being a greeter or reception attendant, a companion for the elderly, a messenger, or a surveillance systems monitor.

Arsenault appealed to the Appeals Council, which denied her request for review of the ALJ's decision. At that point, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). She subsequently appealed to this court.

## II.  STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the ALJ's decision. 42 U.S.C. § 405(g) (2003). My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence. Id.; see Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence.  See Ortiz, 955 F.2d at 769.  Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'"  Id. (quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  I apply these standards in reviewing Arsenault's case on appeal.

## III.  **DISCUSSION**

The Social Security Act defines "disability" for the purposes of Title II as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (2003).  When evaluating whether a claimant is disabled due to a physical or mental impairment, an ALJ's analysis is governed by a five-step sequential evaluation

-16-

process.  See 20 C.F.R. § 404.1520 (2003).  The ALJ is required to consider the following issues when determining if a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents or prevented the claimant from performing past relevant work; and (5) whether the impairment prevents or prevented the claimant from doing any other work.  20 C.F.R. § 404.1520 (2003).  An affirmative answer at one step leads to the next step in the analysis.  Id.  If the answer to questions (3) or (5) is affirmative, the claimant is disabled.  Id.  If the answer to any question other than (3) is negative, the claimant is not disabled.  Id.  The claimant bears the burden on the first four steps.  At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform."  20 C.F.R. § 416.920(f) (2003); Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam).  The Commissioner must show that the claimant's limitations do not prevent her from engaging in substantial gainful work, but need

not show that the claimant could actually find a job.  See Keating, 848 F.2d at 276.

Arsenault argues that the ALJ did not properly consider step three, when he found that her impairment did not meet, nor was medically equivalent to, a listed impairment.  She also argues that he did not properly consider the effect of pain on her ability to work, and that the evidence does not support his finding regarding her credibility.  Because I agree with Arsenault's first argument, I need not address the others.

The ALJ found that Arsenault had "biceps tendinitis and adhesive capsulitis, impairments that are severe within the meaning of the Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart. P., Regulation No. 4."  (Tr. 15).  Arsenault asserts that she meets the impairment listed as 1.08, which states

> *Soft tissue injury (e.g., burns)* of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset . . .

20 C.F.R. 404.1525, subpt. P, app. 1.  Continuing surgical management is defined at 1.00M as

-18-

> *Under continuing surgical management* . . . refers to
> surgical procedures and any other associated treatments
> related to the efforts directed toward the salvage or
> restoration of functional use of the affected part.  It
> may include such factors as post-surgical procedures,
> surgical complications, infections, or other medical
> complications, related illnesses, or related treatments
> that delay the individual's attainment of maximum
> benefit from therapy.

Id.

The ALJ did not mention Listing 1.08, or any other listing, in his decision.  He stated only that found that she did not meet any of the listings in the SSA regulations, and that in making that decision, he "considered the opinions of the State agency medical consultants who evaluated this issue at the initial and reconsideration levels."  (Tr. 15).

Because the ALJ did not explain why Listing 1.08 was not met, I cannot determine whether his decision on this point is supported by substantial evidence.  Accordingly, I remand the case to the ALJ for further consideration.  See Burnett v. Comm'r, 220 F.3d 112, 119-20 (3d Cir. 2000)(remand required where ALJ "'merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed impairments' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning").

## IV. <u>CONCLUSION</u>

Because the ALJ did not properly consider and analyze whether Arsenault's disability fits into Listing 1.08, I remand to the commissioner for further consideration consistent with this opinion.


SO ORDERED.

_____
Paul Barbadoro
Chief Judge

May 5, 2004

cc: David Bander, Esq.
    David L. Broderick, AUSA
    Roger D. Turgeon, Esq.